**UNITED STATES of America,**

v.

**Bruce CUTLER, Defendant.**

**No. 91 CR 1189.**

United States District Court, E.D. New York.

March 8, 1993.

Mary Jo White, U.S. Atty. by John J. Gallagher, Kelly D. Talcott, Special Prosecutors, Brooklyn, NY, for U.S.

Goldman & Hafetz by Frederick P. Hafetz, Susan Necheles, Kaplan & Katzberg by Robert F. Katzberg, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

Defendant Bruce Cutler moves to dismiss the criminal contempt charges in their entirety or, in the alternative, to dismiss certain specified charges in the Order to Show Cause

charging defendant with criminal contempt of Court in violation of 18 U.S.C. § 401(3). For the reasons set forth below, these motions are denied.

## BACKGROUND

This proceeding arises out of a series of extrajudicial statements made by Bruce Cutler during Cutler's representation of John Gotti in the criminal matter *United States v. Gotti*. The case was the subject of virtually unprecedented media coverage, with both Mr. Cutler and the Government vying for the microphone. The Government urges that, although much of the evidence in the *Gotti* case was sealed at defense counsel's request, Cutler waged an intensive media campaign to shape the public's perception of John Gotti and the evidence against him. The campaign was intended to create an "aroma" or pervasive theme that John Gotti was the victim of overzealous and corrupt Government prosecutors. It was statements made by Cutler in the course of this media campaign that the Government charges ran afoul of Local Rule 7 and, consequently, Judge Glasser's three statements regarding the local rule which the Government claims to be orders.

### A. December 21, 1990, "Admonition" to Comply with Rule 7

On December 16, 1990, defense counsel Gerald Schargel requested that Judge Glasser close the detention hearing for Gotti and his co-defendants, Salvatore Gravano, Frank Locascio and Thomas Gambino, in order to prevent the prospective pool of jurors from becoming contaminated by the deluge of pretrial publicity. (Appendix to Mem. of the U.S. in Opp. to Def.'s Mot. to Dismiss Criminal Contempt Charges [hereinafter "Gov't.'s Appendix"], Ex. 1.) The Government opposed closure on the ground that a fair trial could be assured by *voir dire* or other available means. (Gov't.'s Appendix, Ex. 2.) The media agreed, noting that the publicity surrounding the case was already "so widespread" that closure would have little effect. (Gov't.'s Appendix, Ex. 3.)

On December 21, 1990, the Government, defense counsel, and the media appeared before Judge Glasser to argue the motion to

close the detention hearing. Judge Glasser decided to close the detention hearing, concluding that there was a "substantial probability that the defendants' right to a fair trial will be prejudiced by the publicity that closure would prevent" and that there existed no reasonable alternatives that would adequately protect that right. (Dec. 21, 1990, Tr. at 38–40, Gov't.'s Appendix, Ex. 4.)

After so ruling, Judge Glasser admonished counsel for both sides to comply with Local Rule 7:

> But I feel very strongly about the things I said out in that courtroom this morning. I feel very strongly about the conduct of this trial in an orderly and fair way and I feel very strongly about Rule 7 of the local rules of this Court with respect to fair trial and free press.
>
> That rule spells out, I believe, in some detail, what it is that it is appropriate for defense lawyers to be commenting about. You, Mr. Cutler. What it is appropriate to be talking to the press about, what it is appropriate for the government to be talking to the press about, whether it is this case or any other case, *shouldn't be tried in the newspapers. It should be tried in the courtroom* . . . .
>
> My admonition simply is, observe Rule 7 and observe the ABA standards for criminal justice which in Chapter Eight sets out the appropriate considerations with respect to fair trial and free press.
>
> The statements that this is a circus, it is a frame up, *try your case in the courtroom.*
>
> Okay I feel strongly about that . . . .
>
> Ladies and gentlemen, again, I am serious about fair trials. I am serious about Rule 7. I am serious about the ABA standards of criminal justice. *I don't want this trial to be conducted anywhere else but in this courtroom, in accordance with the rules,* which are designed to insure fairness for the government, fairness for the defendant.
>
> Defendants are entitled to a fair trial. So are the people, so is the government. *I am going to make every effort to assure that this is going to be accomplished,*

> *that goes for conduct outside and inside the courtroom.*

(Dec. 21, 1990, Tr. at 44–46, Gov't.'s Appendix, Ex. 4 (emphasis added).)

Neither the Government nor defense counsel objected to this "admonition". On the following day, however, Cutler was quoted in no less than three newspapers, commenting on the prosecution of John Gotti. In the *New York Daily News,* Cutler stated that the Government witnesses were the "same bums" and the Government tapes the "same tapes" used in previous cases against Gotti and that the tapes should not therefore present a problem to the defendants' winning the case. (Order to Show Cause ¶ 5(a).) In *New York Newsday,* Cutler commented that the Government has "thrown the Constitution out the window when it comes to Mr. Gotti." (Order to Show Cause ¶ 5(b).) In the *New York Post,* Cutler similarly noted that "[t]hey threw the Constitution out the window when it comes to Mr. Gotti." (Order to Show Cause ¶ 5(c).)

### B. *January 9, 1991, "Instruction" to Comply with Rule 7*

The parties again appeared before Judge Glasser on January 9, 1991, at which time the Court expressed its dismay that, despite its best efforts, information revealed during the closed detention hearing had nevertheless found its way into newspapers and on television. Judge Glasser instructed the parties that his "orders" were to abide by Local Rule 7:

> . . . I called counsel into chambers at the end of the first day in which we all met. I made it very clear that *I feel strongly about not trying this case in the newspapers* for the reason that I think the Sixth Amendment right is a significant one.
>
> *I made it clear that there is a rule, it's Local Rule 7 which carefully proscribes out-of-court comments by defense and by prosecutors.*
>
> It may be that all of us will be enlightened before too long as to just how far counsel can go, because the Supreme Court heard argument on that issue the other day. And I'm certainly awaiting

that decision very anxiously. But how does that get out?

*... I don't know where that emanated from, but I want it to stop....*

*I've made my position clear and I'll exercise all the power which is at my disposal to do whatever I can to enforce the orders of this Court and to hold those persons who I discover to be responsible for violating those orders accountable.* I don't see any need to belabor that.

(Jan. 9, 1991, Tr. at 44–45, Gov't.'s Appendix, Ex. 5 (emphasis added).)

As with December 20, 1990, "admonition", neither defense counsel nor the Government objected to the Court's "order". Nevertheless, on the following day, Cutler was quoted in *New York Newsday,* commenting that the Government's tapes contained denials by Gotti that he had been involved in the murder of Paul Castellano and that Gotti "had nothing to do with [the Castellano homicide]. So why wouldn't there be denials?" (Order to Show Cause ¶ 5(d).)

On January 18, 1991, the Government moved to disqualify defense counsel from representing the *Gotti* defendants during trial. The motion and its opposition papers were filed under seal in keeping with the intended effect of the Court's December 21, 1990, order preventing disclosure of all evidence offered at the detention hearing. Nevertheless, Judge Glasser decided that oral argument on the motion would be open to the public.

In response to these developments, media coverage of the *Gotti* continued unabated. Indeed, from the outset, the media had participated in the *Gotti* case as a party of sorts, filing various briefs outlining its interest in full disclosure of all the facts surrounding the prosecution. On March 15, 1991, the media moved for an order unsealing the legal memoranda and evidence submitted with regard to the disqualification motion. (Gov't.'s Appendix, Ex. 8.) The media argued that unsealing was warranted because the open oral argument on February 22, 1991, had already allowed for widespread disclosure of much of the information pertaining to the pending disqualification motion. As with the detention hearing, the Government supported the

motion to unseal, whereas defense counsel argued that it would violate the *Gotti* defendants' Sixth Amendment right to a fair trial by prejudicing potential jurors in the case. (Gov't.'s Appendix, Exs. 6, 9.)

While the Court considered the Government's disqualification motion, Cutler did little to curb his contact with the press. On January 23, 1991, Cutler was quoted in *The New York Times* as saying that the "Government will stop at nothing in their quest to convict Mr. Gotti". (Order to Show Cause ¶ 5(e).) On February 7, 1991, he told *New York Newsday* that the Government tells "everyone and anyone that the key to open their cell door is giving false evidence against Mr. Gotti." (Order to Show Cause ¶ 5(f).) On February 23, 1992, Cutler was quoted in *New York Newsday,* commenting that "[m]y position is that the government will do anything to convict these defendants." (Order to Show Cause ¶ 5(g).) On February 28, 1991, Cutler commented to the *New York Post* that the Government's "tapes do not say what Mr. Gleeson [the prosecutor] says they say, and the conversations that he put forth are totally and deliberately taken out of context by the Government." (Order to Show Cause ¶ 5(h).)

Other comments to the press by Cutler in the wake of Judge Glasser's first two statements included:

—On March 7, 1991, Cutler was quoted in *The New York Times,* commenting that the Government is waging a "continuing vendetta to create cases against John Gotti." (Order to Show Cause ¶ 5(i).)

—On April 7, 1991, Cutler was featured on the television program *60 Minutes,* stating that he admired Gotti for his "[l]oyalty, honesty, integrity", that Cutler had not "seen any evidence of what the Government calls an 'Italian–American Mafia' in the United States", that the Government's tapes "don't say what the prosecutor says they say", and that the Gotti prosecution was an example of "McCarthyism". (Order to Show Cause ¶ 5(j).)

—On May 7, 1991, Cutler commented on the television program *Thirteen Live*

that "[i]n my opinion the federal government has thrown the Constitution out the window when it comes to John Gotti", that the federal prosecutors were "vindictive" and engaging in "retribution" and "sour grapes", that once Gotti was "acquitted again, the fourth time in five years, the joy will be twice as good", that the Government had detained Gotti even though Gotti "hasn't committed a crime, hasn't been convicted of a crime" and that the Government was "persecuting John Gotti". (Order to Show Cause ¶ 5(k).)

—On July 14, 1991, Cutler was quoted in *The New York Times*, stating that the prosecutors "lie" when "they claim they want a fair fight" and that the prosecutors "would like a rigged deck" because they "are afraid of a fair and good fight". (Order to Show Cause ¶ 5(l).)

—On July 20, 1991, Cutler was quoted by the *New York Daily News* as saying that "John Gotti is loved more than anyone else in the city. No one but the government wants to hurt him." (Order to Show Cause ¶ 5(m).)

—In the August 1991 issue of *Interview Magazine*, which was available on the newsstands prior to July 22, 1991, Cutler commented that "people think and believe that [Gotti is] the subject of a relentless vendetta", that local law enforcement agencies are not "in the business of creating and orchestrating crime the way the federal government does", that Cutler has not "seen any proof of an Italian–American Mafia structure in this country", that the Government goes to prisons and asks inmates "to tell us what you know or what you want to tell us about John Gotti" and "if you sing our song about John Gotti, you'll be on the beach someplace, not in jail", and that "[t]his is what was going on in the McCarthy era". (Order to Show Cause ¶ 5(n).)

The Government responded to these extrajudicial statements by seeking sanctions against Cutler. (Gov't.'s Appendix, Ex. 12.) Cutler opposed the imposition of sanctions, arguing that his comments were not reasonably likely to interfere with a fair trial or otherwise prejudice the administration of justice and therefore, did not violate Local Rule 7. (Gov't.'s Appendix, Ex. 13.) He further argued that the comments attributed to him were incorrect or taken out of context. Finally, he argued that Rule 7's "reasonable likelihood" standard was an unconstitutionally broad restriction on attorney speech and that the comments should be assessed according to a "clear and present danger" standard.

## C. *July 22, 1991, Order to Comply with Rule 7*

On July 22, 1991, Judge Glasser instructed the parties to appear before him to discuss the extensive pre-trial publicity regarding the *Gotti* case and, in particular, Cutler's comments to the media. During the conference, Judge Glasser ordered counsel in no uncertain terms that they must comply with Rule 7 or face the Court's contempt powers:

> What I am trying to do, I am just putting you on notice. I wanted to tell you, too, I don't want to have to say it twice, the next time I have to say it I am going to ask to show cause why I shouldn't hold you in contempt.
>
> Okay, I am putting you on notice. Stop trying this case in the newspaper. Try it in the courtroom....
>
> I don't know how I can be more clear than that. That's it. I want it stopped now. The response ought to be, no comment. The Judge has said that I can't talk about the case, period....
>
> Rule 7 ... is, in essence, a kind of gag order. The thing you ought to say is, there is a case pending, the rules of this Court say I can't comment on it. No comment ....
>
> Rule 7 ... tells you what you can't talk about....
>
> I am going to tell you now that the Supreme Court [in *Gentile v. State Bar of Nevada,* — U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) ] has said that Rule 7 does not run afoul of the First Amendment.

*Please pay attention to what I ask you to do myself. Do it. That's all do it. It's simple.*

(July 22, 1991, Tr. at 6, 10–12, Gov't.'s Appendix, Ex. 14 (emphasis added).) Neither the Government nor defense counsel objected to this order by the Court.

In an order dated August 1, 1991, Judge Glasser ruled that the record pertaining to the detention hearing and the motion to disqualify Cutler and co-defense counsel Gerald Schargel and John Pollok[1] would be unsealed. *United States v. Gotti*, 771 F.Supp. 567 (E.D.N.Y.1991). Given the virtual flood of media attention to the *Gotti* prosecution and the Court's previous denial of the motion to suppress the fruits of the Government's electronic surveillance, the Court observed that any "[a]dditional publicity which may flow from unsealing the record at this time would add microscopic grains, if even that, to the balance in favor of the Sixth Amendment." *Id.* at 569. The Court went on to note that various public declarations made by Cutler[2] had seriously undermined public confidence in our system of justice and the constitutional protections it claims to afford and that disclosure of judicial processes was an appropriate means to dispel those doubts. *Id.* at 569–70.

Notwithstanding the Court's July 22, 1991, order to comply with Rule 7 and the absence of any objection thereto, Cutler continued making extrajudicial statements concerning the *Gotti* case:

—On July 27, 1991, the *New York Daily News* reported Cutler's statement that the prosecutors in the *Gotti* case are "a sick and demented lot" on a "personal vendetta" and "witch hunt against John Gotti". (Order to Show Cause ¶ 7(a).)

—On July 27, 1991, Cutler was quoted in the *New York Post*, stating that the prosecutors "don't want a fair fight" and that the Government tapes are "innocuous—there's nothing to them". (Order to Show Cause ¶ 7(b).)

—On July 27, 1991, *The New York Times* reported Cutler's comment that the "Federal Government doesn't want a fair fight [and] cannot win a jury trial". (Order to Show Cause ¶ 7(c).)

—On July 27, 1991, Cutler commented in *New York Newsday* that the Assistant United States Attorney prosecuting the *Gotti* case is [1] "obsessed and possessed" with the idea of convicting Gotti and [2] "is on a witch hunt", [3] that the Government is "very, very resentful of [Gotti's] popularity", and [4] that "95% of their proof is that he hangs out in social clubs. This makes a guy a so-called head of organized crime? Give me a break." (Order to Show Cause ¶ 7(d).)[3]

—On July 28, 1991, *New York Newsday* quoted Cutler as stating that Gotti lives "a certain lifestyle and it is not a lifestyle of crime", that "[p]rosecutors keep indicting him because they don't like him, his friends and the way he lives", that the Assistant United States Attorney prosecuting the case "has a personal vendetta", and that the Government has Gotti "locked up on some trumped-up charge". (Order to Show Cause ¶ 7(e).)

---

1. The Court ordered the disqualification of Cutler, Schargel, and Pollok on August 1, 1991. *United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y. 1991). The Court based its decision in large part on evidence of "benefactor payments" made by Gotti to the attorneys in order to secure legal counsel for the entire Gambino crime family and on the distinct possibility that defense counsel would be called as witnesses in the criminal proceeding against their clients. *Id.* at 560–63.

2. Although the Court did not identify Mr. Cutler by name in its opinion, the comments it cited are those attributed to him in the newspapers and magazines cited above: "that 'the Constitution has been thrown out the window' in this court;

that the indictment returned against the defendants by a duly constituted grand jury was a manifestation of governmental vindictive vendetta; that the prosecutor has lied to the court." *Id.* at 569.

3. The Government agrees with defendant that, based upon the evidence defendant has submitted in his supplemental motion, the statements designated as [3] and [4] of Paragraph 7(d) of the Order to Show Cause pre-date Judge Glasser's three directives and therefore cannot form the basis for a finding of contempt. Accordingly, this Memorandum and Order considers only statements [1] and [2] of Paragraph 7(d).

—On August 2, 1991, *New York Newsday* reported that Cutler stated that the Government's taped conversations "are not evidence of any crimes, and they are meaningless". (Order to Show Cause ¶ 7(f).)

—On August 2, 1991, *The New York Times* reported Cutler's comment that the Government's taped conversations "are not crimes; they are taken out of context by the prosecutors and deliberately given a negative connotation by the prosecutors". (Order to Show Cause ¶ 7(g).)

—On August 3, 1991, Cutler commented in *New York Newsday* that Gotti would be "vindicated again" and that the excerpted portions of the Government's tapes were "snippets deliberately taken out of context by the prosecutors". (Order to Show Cause ¶ 7(h).)

—On August 3, 1991, Cutler stated in *The New York Times* that Gotti would be "vindicated again" and that the Government's tapes "were deliberately taken out of context by the prosecutors" and "are not evidence of criminality". (Order to Show Cause ¶ 7(i).)

—On August 4, 1991, Cutler was quoted in *New York Newsday* and *Gannett Suburban Newspapers*, stating that the Government's "tapes are not evidence of any criminality whatsoever" and that "[w]hen the whole tapes are played, not just the snippets, he will be vindicated like before". (Order to Show Cause ¶ 7(j).)

—On August 13, 1991, Cutler appeared on the local television program, *9 Broadcast Plaza*, and made a series of statements about the *Gotti* case, including statements that: wherever Gotti lives, there is no problem with drugs and crime in the neighborhood; Gotti is not a danger to any community other than federal prosecutors; Gotti has "admirable qualities", including being courageous, loyal, sincere, selfless and devoted to his family; Gotti is a "good man" and an "honorable man"; Gotti is not a "ruthless man"; Gotti is one of "the most compassionate men" Cutler knows; Gotti is "deadly against drugs". Cutler also commented that: the prosecutors "are doing everything they can to destroy John Gotti" and are "dealing in vendettas", "on a witch hunt", and "framing people"; the Government "threw the Constitution out the window" and is on a "vendetta" against Gotti; the prosecution is an "example of McCarthyism"; Gotti was being "persecuted" because of his "lifestyle" and "friends" and that the prosecutors want to "destroy" Gotti "because of his popularity" and because "he's deadly against drugs"; jurors know the "evidence is phony", the "tapes are phony" and that is why they vote not to convict. Moreover, Cutler wondered aloud who would compensate Gotti "when he's acquitted a fourth time". Finally, Cutler noted that the Government is "creating cases against individuals they target" by "giving freedom to drug dealers and murderers if they will sing the government's tune against the likes of John Gotti" and that jurors realize that "the witnesses lie" and that "even the federal investigators lie" and that is why they vote "not guilty unabashedly." (Order to Show Cause ¶ 8 & Ex. I.)

## DISCUSSION

### I. *Motion to Dismiss the Criminal Contempt Charges in Their Entirety*

Defendant makes a series of arguments in support of his motion to dismiss the criminal contempt charges. Defendant first contends that Judge Glasser's first two statements to counsel, on December 21, 1990, and January 9, 1991, were not clear, definite, unambiguous directions and therefore did not constitute orders upon which the criminal contempt charges against defendant could properly be based. Defendant further argues that Rule 7 is too vague to form a legally sufficient basis for criminal contempt. Finally, defendant mounts a three-prong constitutional argument, asserting that Rule 7 is inherently vague, violates the First Amendment standard for attorney speech, and is viewpoint-discriminatory. This Court will address each of these arguments in turn.

## A. *The Validity of the Contempt Orders*

Defendant's principal argument in support of his motion to dismiss is that there were no clear, specific, or unequivocal orders upon which to base the criminal contempt charges in this action. This argument is twofold: first, that Judge Glasser's first two statements to counsel to obey Rule 7 were not sufficiently clear to amount to orders; and second, that the third statement, while it obviously constituted an order to comply with Rule 7, was premised upon a local rule too vague to justify a contempt proceeding for disobeying the mandate to follow it.

### 1. Judge Glasser's December 20, 1990, and January 9, 1991, Statements

As noted above, Judge Glasser admonished the Government prosecutors and defense counsel that he wanted them to comply with the provisions of Local Rule 7 on December 21, 1990, instructed them that his "orders" were to do so on January 9, 1991, and ordered them to do so on July 22, 1991. However, defendant disputes the Government's characterization of Judge Glasser's first two statements as "orders", arguing that the Court's statements simply fail to meet the rigorous standard set forth in 18 U.S.C. § 401, the federal criminal contempt statute.

Section 401 provides in relevant part that:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401 (1988). In interpreting this statute, courts have been quick to recognize the awesome power of the Court to punish those failing to obey its directives and have sought to temper this power by exercising it cautiously and with due regard for the defendant's constitutional rights. *See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *In re McConnell,* 370 U.S. 230, 233–34, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962); *UFI Razor Blades, Inc. v. District 65, Wholesale, Retail, Office & Processing Union,* 610 F.2d 1018, 1024 (2d Cir.1979).

Consonant with the courts' recognition of the drastic and far-reaching effect of the contempt power is the well-settled rule that the contempt power may not be exercised unless the judicial order alleged to have been violated is "definite and specific". *United States v. Charmer Indus., Inc.,* 722 F.2d 1073, 1079 (2d Cir.1983); *see also UFI Razor Blades, Inc.,* 610 F.2d at 1024; *United States v. Masselli,* 638 F.Supp. 206, 213 (S.D.N.Y.1986). Wilful disobedience of a court order is a necessary prerequisite to the imposition of criminal contempt; it therefore follows that an ambiguous and equivocal order would necessarily preclude such a finding. *See United States v. Joyce,* 498 F.2d 592, 596 (7th Cir.1974) ("where there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance to the court's authority"). Thus, the order must be sufficiently clear that it leaves no doubt about what is required to be done. *International Longshoremen's Ass'n,* 389 U.S. at 76, 88 S.Ct. at 208.

The clarity of an order is a question of fact which must be judged according to a reasonableness standard in the context in which it was entered and the audience to which it was addressed. *United States v. Turner,* 812 F.2d 1552, 1565 (11th Cir.1987); *see also United States v. Revie,* 834 F.2d 1198, 1201 (5th Cir.1987) ("Determining whether or not an order is specific requires a factual inquiry into the reasonableness of the order's specificity, given the context in which it was issued."), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988). There is no particular word or phrase that serves as a talisman in converting the benign or the cautionary into an "order" for the purposes of criminal contempt. The Court must consider the relevant facts at the time the directive was issued.

Since defendant himself willingly characterizes Judge Glasser's third statement as an "order" to comply with Rule 7 (Def.'s Mem. of Law in Supp. of his Mot. to Dismiss Crim. Contempt Charges at 2), this Court is free to proceed under the assumption that there was

one concededly valid order for the purposes of this motion. The other two directives at issue herein—Judge Glasser's December 20, 1990, and January 9, 1991, statements—present issues of fact whether they were sufficiently definite and clear to be fully enforceable and, if so, whether the defendant's statements were wilfully made and fall within the ambit of the specific prohibitions contained in Rule 7.

■ At the very least, the Court's statements constituted warnings to comply with Rule 7 and, as such, they possess significant evidentiary value with regard to defendant's wilfulness in violating Judge Glasser's July 22, 1991, order. A literal reading of Judge Glasser's December 20, 1990, statement seems to imply that his intention was to warn counsel to adhere to the strictures of Rule 7: "My admonition simply is, observe Rule 7." (Dec. 21, 1990, Tr. at 44–46, Gov't.'s Appendix, Ex. 4.) But, despite this statement's seemingly cautionary tone, it must be read in the context of Judge Glasser's other statements that day in which he told counsel that "I feel very strongly about Rule 7", that "I am serious about Rule 7", "try your case in the courtroom", "I don't want this trial to be conducted anywhere else but in this courtroom", and that "I am going to make every effort to assure that this is going to be accomplished". (Dec. 21, 1990, Tr. at 44–46, Gov't.'s Appendix, Ex. 4.)

Interpretation of Judge Glasser's January 9, 1991, statement poses a similar factual quandary. Judge Glasser began the conference by reminding counsel of the existence of Rule 7: "I made it clear that there is a rule, it's Local Rule 7 which carefully proscribes out-of-court comments." Then, seemingly retreating even further from an admonitory stance, he noted that "[i]t may be that all of us will be enlightened before too long as to just how far counsel can go." Later on in his statement, however, Judge Glasser stated forcefully, "I don't know where that emanated from, but I want it to stop.... I've made my position clear and *I'll exercise all the power which is at my disposal to do whatever I can to enforce the orders of the court and to hold those persons who I discover to be responsible for violating those orders ac-*

*countable."* (Jan. 9, 1991, Tr. at 44–45, 49–50, Gov't.'s Appendix, Ex. 5 (emphasis added).)

Moreover, Judge Glasser's December 20, 1990, and January 9, 1991, statements must be assessed in the context of the audience to which it was addressed—defense counsel with a wealth of experience in the federal courts of both the Eastern and Southern Districts of New York. While a layperson might not be expected to understand some of the more technical references in Judge Glasser's statement, such as Rule 7 and Chapter Eight of the American Bar Association Standards for Criminal Justice, this language and the expectation arising therefrom should be comprehensible to a seasoned member of the criminal defense bar. *Cf. United States v. Turner,* 812 F.2d at 1565 ("it may well be necessary that the specificity of orders directed to laypersons be greater than that of orders to lawyers"); *In re Williams,* 509 F.2d 949, 960 (2d Cir.1975) (court's legal rulings on relevancy and on volunteering testimony were likely to confuse layperson witness and therefore precluded essential finding of wilful disregard of a judicial order).

■ Attorneys admitted to practice in this Court have a sworn obligation to have read, be familiar with, and faithfully adhere to the Rules of this Court, including Local Rule 7 of the Criminal Rules. They also have an ethical obligation to adhere to A.B.A. Model Rule of Professional Conduct 3.6 and Chapter Eight of the A.B.A. Standards for Criminal Justice ("Fair Trial and Free Press")—both of which impose a somewhat less restrictive "substantial likelihood of material prejudice" standard with respect to extrajudicial statements. Indeed, as officers of the Court, " 'attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice.' " *Gentile,* —— U.S. at ——, 111 S.Ct. at 2745 (quoting *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 601 n. 27, 96 S.Ct. 2791, 2825 n. 27, 49 L.Ed.2d 683 (1976)).

■ Given the professional obligations with which attorneys are expected to be familiar, it may well be that an order to comply

with such obligations need not rise to the same level of specificity as an order directed at conduct that is not otherwise regulated. Whether such a rationale might justify imposition of criminal contempt against defendant may not be adequately considered at the present time, however, given the limited facts before this Court. The factual issues presented herein can only be given their due consideration at trial. Defendant's motion with regard to Judge Glasser's December 20, 1990, and January 9, 1991, statements must therefore be denied.

### 2. Local Rule 7 as the Basis for Judge Glasser's July 22, 1991, Order

█ Defendant concedes that Judge Glasser's July 22, 1991, statement amounted to an order for criminal contempt purposes, but urges that the substance of the order—Local Rule 7 and its "reasonable likelihood of interference with a fair trial" standard—made the order too unclear, indefinite and equivocal to find him in contempt of Court.

Local Rule 7, "Free Press–Fair Trial Directives", provides in pertinent part that:

(a) *It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which a lawyer or a law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice,* [sic] With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers or otherwise to aid in the investigation.

From time of arrest, issuance of an arrest warrant or the filing of a complaint, information or indictment, in any criminal matter until the commencement of trial or disposition without trial, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, relating to that matter and concerning:

(1) The prior criminal record (including arrests, indictments or other charges of crime), or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the accused's name, age, residence, occupation and family status; and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in the accused's apprehension or to warn the public of any dangers the accused may present;

(2) The existence or contents of any confession, admission or statement given by the accused, or the refusal or failure of the accused to make any statement;

(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

(4) The identity, testimony or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law, [sic]

(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

The foregoing shall not be construed to preclude the lawyer or law firm during this period, in the proper discharge of his, her, or its official or professional obligations, from announcing the fact and circumstances of arrest (including time and place of arrest, resistance, pursuit and use of weapons), the identity of the investigating and arresting officer or agency and the length of investigation; from making an announcement, at the time of seizure of

any physical evidence other than a confession, admission or statement, which is limited to a description of the evidence seized; from disclosing the nature, substance or text of the charge, including a brief description of the offense charged; from quoting or referring without comment to public records of the court in the case, from announcing the scheduling or result of any stage in the judicial process; from requesting assistance in obtaining evidence; or from announcing without further comment that the accused denies the charges.

E.D.N.Y.Crim.R. 7 (emphasis added).

As with Judge Glasser's December 20, 1990, and January 9, 1991, statements to counsel in the *Gotti* case, the July 22, 1991, order raises issues of fact which can only be resolved by the trier of fact after considering all the evidence in this case. Defendant's alleged statements to the press on July 27, 1991, set forth in Paragraph 7(a) of the Order to Show Cause that prosecutors are "a sick and demented lot" on a "personal vendetta" and "witch hunt against John Gotti" certainly could be found by a trier of fact to be an opinion as to the innocence of the accused, as well as a comment on the evidence in the case. The same is true of the first two comments set forth in Paragraph 7(d) alleging that on July 27, 1991, defendant referred to the prosecutor in the *Gotti* case as an "obsessed and possessed" individual "on a witch hunt". In Paragraphs 7(f) and (g), defendant is alleged to have said on August 2, 1991, that the Government's Title III materials are "not evidence of any crimes" and are "meaningless", "taken out of context", and "given a negative connotation"—all of which may fall within the comment-on-the-evidence prohibitions if the trier of facts so finds.

Notwithstanding the possibility of such an interpretation, whether these extrajudicial statements really were the result of defendant's wilful violation of a clear and definite order is a question of fact that must await a trial on the merits. *See* Fed.R.Crim.P. 12(e) (authorizing courts to defer determination of pretrial motions until the trial of the general issue for good cause); *see also* 1 L. Sand,

Modern Fed. Jury Instructions (Crim.), Instruction 20–14 (1992) ("In determining whether an order was sufficiently specific or definite, the court should consider the entire background behind the order, including the conduct that the order was meant to enjoin or secure, the interests it was trying to protect, the manner in which it was trying to protect them, and any past violations and warning."); 1 C. Wright, Fed.Prac. & P. § 194 at 709–10 (court may defer decision of pretrial motion if factual matters are relevant to the decision). The charges herein are serious and it would not serve justice for this Court to attempt to secondguess defendant's intentions based on the necessarily limited factual record contained in the parties' motion papers when it could defer its ruling until trial and benefit from a full evidentiary record and a more complete understanding of the facts of a complicated case. *See United States v. Marcello*, 508 F.Supp. 586, 594 (E.D.La.1981), *aff'd on other grounds, sub nom. United States v. Roemer*, 703 F.2d 805 (5th Cir.1983).

### B. *Constitutionality of Rule 7*

Defendant goes on to attack the constitutional validity of Local Rule 7, alleging that the rule's inherent vagueness, its restrictions on attorney speech, and its viewpoint discriminatory provisions render it transparently invalid and therefore an improper basis for any contempt citation.

#### 1. Collateral Bar Doctrine

In addressing defendant's argument, we must keep in mind, above all, that this is a contempt proceeding and not a disciplinary proceeding concerning Rule 7. Accordingly, this Court is required to begin its analysis from the premise of the constitutionality of the order and the rule underlying it, as would an attorney who chose to challenge it.

Under the collateral bar doctrine, a judicial order must be obeyed until vacated or overruled unless the order is transparently invalid or the Court issuing the order lacked subject matter jurisdiction. *See Walker v. City of Birmingham*, 388 U.S. 307, 315, 321, 87 S.Ct. 1824, 1829, 1832, 18 L.Ed.2d 1210 (1967); *In re Providence Journal Co.*, 820 F.2d 1342, 1346 (1st Cir.1986),

*modified,* 820 F.2d 1354 (1st Cir.1987) (en banc) (per curiam), *cert. dismissed,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988).

In *Walker,* the Supreme Court upheld an Alabama State Court's conviction of Dr. Martin Luther King, Jr. and other civil rights activists for criminal contempt based upon their violation of a temporary injunction barring them from participating in a parade without a permit. The protesters argued that they were entitled to disregard the injunction because it was premised upon a municipal ordinance that imposed unconstitutional prior restraints upon their First Amendment rights of free speech and assembly.

Observing that the injunction and its underlying ordinance were so generalized as to raise "substantial" constitutional issues, *Walker,* 388 U.S. at 316, 317, 87 S.Ct. at 1829, 1830, the Supreme Court nonetheless found that it was not "transparently invalid", *id.* at 315, 87 S.Ct. at 1829, and upheld the convictions on the ground that the protesters should not be allowed to "bypass orderly judicial review of the injunction before disobeying it." *Id.* at 320, 87 S.Ct. at 1832. The Court concluded:

> This Court cannot hold that petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets. One may sympathize with the petitioners' impatient commitment to their cause. But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

*Id.* at 321, 87 S.Ct. at 1832; *see also Howat v. Kansas,* 258 U.S. 181, 190, 42 S.Ct. 277, 281, 66 L.Ed. 550 (1922) ("It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished."); *Providence Journal Co.,* 820 F.2d at 1346 ("As a general rule, a party may not violate an order and raise the issue of its unconstitutionality collaterally as a defense in the criminal contempt proceeding.").

■ These cases make clear that an attorney seeking to avoid contempt citation for a wilful violation of a judicial order would be required either to seek permission of the Court to make statements of the kind at issue here or bring an action declaring the substance of the order to be unconstitutional. In the instant case, defendant made no effort to challenge the validity of Judge Glasser's directives by filing a motion to vacate or by seeking review in the Court of Appeals for the Second Circuit. If truly confounded by the requirements of Rule 7, he could have, at the very least, requested some clarification or guidance from the Court as to the acceptable parameters of extrajudicial speech. But, although he certainly had ample opportunity to do so in his three conferences with Judge Glasser, defendant never objected. It is only now, faced with the dire prospect of being held in criminal contempt of Court, that defendant raises this constitutional challenge to Judge Glasser's directives.

### 2. Inherent Vagueness of Rule 7

■ There is no merit to defendant's contention that Local Rule 7 is inherently vague and therefore cannot form the basis of a criminal contempt charge. The contempt power is a potent one and may only be exercised in those instances where the defendant has wilfully violated a clear and definite order. In this vein, Cutler contends that Judge Glasser's orders required counsel to determine whether their statements were "reasonably likely" to prejudice a jury and that it was impossible to make such a determination with any degree of certainty.

In *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Supreme Court enunciated the test for determining vagueness in the context of speech restrictions:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discrim-

inatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms."

*Id.* at 108–09, 92 S.Ct. at 2298–99 (footnotes omitted); *see also Amato v. County of Suffolk,* 668 F.Supp. 151, 155 (E.D.N.Y.1987), *aff'd,* 847 F.2d 834 (2d Cir.1988). Despite the apparent breadth of this test, the Court upheld the conviction of a demonstrator who violated an anti-noise ordinance prohibiting "any noise or diversion which disturbs or tends to disturb the peace or good order" of the local high school by picketing in front of the school. *Grayned,* 408 U.S. at 107–08, 92 S.Ct. at 2298. Because the ordinance " 'delineate[d] its reach in words of common understanding' ", *id.* at 112, 92 S.Ct. at 2301 (quoting *Cameron v. Johnson,* 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968)), and " 'define[d] boundaries sufficiently distinct' ", *id.* at 114 (footnote omitted), the Court concluded that adequate notice had been provided. *Grayned,* 408 U.S. at 112, 92 S.Ct. at 2301.

In applying the *Grayned* test to the case at bar, it is apparent that Rule 7 is not void for vagueness. Indeed, Local Rule 7 is far more detailed in delineating its reach than the ordinance in *Grayned.* Rule 7 does not simply instruct the attorney to avoid those extrajudicial statements "reasonably likely" to prejudice a fair trial; it sets forth in detail six kinds of out-of-court commentary that violate that standard. *See* E.D.N.Y.Crim.R. 7(a)(1)–(6). There is no need for the attorney to engage in independent guesswork or complicated weighing of interests. Moreover, the rule does not delegate its interpretation to the *ad hoc* and potentially subjective determination of a court of law. So long as an extrajudicial statement falls within one of Section 7(a)'s six subsections and a reasonable person would expect that statement to be disseminated by means of a public com-

munication, it is absolutely prohibited. *See Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press–Fair Trial" Issue,* 87 F.R.D. 519, 523–24 (1980) ("reasonable likelihood" standard "together with the explicit rules that follow it, suffices to inform attorneys what they may or may not say for publication regarding imminent or pending criminal litigation in which they are involved"); *Report of the Committee on the Operation of the Jury System on the "Free Press–Fair Trial" Issue,* 45 F.R.D. 391, 407 (1968) (the specific restrictions that follow Rule 7's "reasonable likelihood" standard "contemplate an absolute prohibition of extrajudicial disclosure by attorneys"). Thus, the specified prohibitions furnish the context in which the "reasonable likelihood" standard is intended to operate.

█ In addition to being sufficiently precise, Rule 7's six prohibitions are narrowly drawn in simple terms commonly understood by those schooled in the law. Section 7(a)(1) not only bars comment on the accused's prior criminal record, character, or reputation, it also defines the breadth of the term "criminal record" and specifies certain kinds of personal data about the accused that may be released despite the character/reputation restriction. Section 7(a)(2) prohibits discussion of the existence or contents of any confession, admission, or statement by the accused or the absence of any such statement. Section 7(a)(3) bars comment regarding the performance of any examinations or tests or the accused's refusal or failure to submit thereto. The other provisions are similarly straightforward, elaborating only where the scope of a particular category of prohibited speech might not be apparent on its face. *See, e.g.,* E.D.N.Y.Crim.R. 7(a)(4) (prohibiting speech regarding the identity, testimony, or credibility of prospective witnesses, except for the victim's identity if not otherwise prohibited by law). Thus, Rule 7 is sufficiently precise to guide attorneys engaged in criminal proceedings in the Eastern District of New York.

### 3. Attorney Speech and Rule 7

█ Defendant argues that Local Rule 7's restrictions on extrajudicial attorney

speech fail to pass constitutional muster because its "reasonable likelihood" standard is so broad as to abridge attorneys' First Amendment rights. In support of his argument, defendant relies upon the recent Supreme Court holding in *Gentile v. State Bar of Nevada,* —— U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), a case involving the validity of Nevada Supreme Court Rule 177 and its regulation of attorneys' extrajudicial statements to the press. As the following discussion will demonstrate, however, the *Gentile* holding does not invalidate the "reasonable likelihood" standard; on the contrary, it provides ample support for the constitutionality of such a standard.

*Gentile* involved an attorney who held a press conference the day after his client was indicted on criminal charges in Nevada. Gentile's extrajudicial speech consisted, *inter alia,* of a brief summary of his client's defense and comments that the State sought the indictment and conviction of an "innocent man", that the police "were playing very fast and loose", and that "the person that was in the most direct position to have stolen the drugs and money ... is Detective Steve Scholl". *Id.* ——, 111 S.Ct. at 2739. The State Bar of Nevada subsequently filed a complaint against Gentile, charging that these statements violated Nevada Supreme Court Rule 177, which prohibited attorneys from making extrajudicial statements to the press that they know or reasonably should know will have a "substantial likelihood of materially prejudicing" the proceeding. *Id.* The Southern Nevada Disciplinary Board found that Gentile's statements met the "substantial likelihood" threshold and recommended that he be privately reprimanded. *Id.* The Nevada Supreme Court affirmed the Board's decision, noting that Gentile's statements fell within the prohibition on comments related to the character or credibility of the police detective and were deliberately timed to have an impact on the case. *Id.* at ——, 111 S.Ct. at 2739–40. The Court concluded that, although it could find no actual prejudice resulting from the statements, that did not necessarily preclude a finding of a substantial likelihood of material prejudice. *Id.* at ——, 111 S.Ct. at 2740.

The Supreme Court reversed the judgment of the Nevada Supreme Court. *Id.* at ——, 111 S.Ct. at 2736. In reaching its decision, the Court addressed two distinct constitutional challenges to the Nevada rule: (1) whether the rule's "safe harbor" provision permitting an attorney to state the general nature of the defense "notwithstanding" certain prohibited statements rendered the rule unconstitutionally vague; and (2) whether the rule's "substantial likelihood" standard, as applied by the State of Nevada, violated Gentile's freedom of speech under the First Amendment.

Opining for the 5–4 majority with regard to the safe harbor provision, Justice Kennedy found it to be void for vagueness in that its grammatical structure misled Gentile into believing that he could state the general nature of his defense without elaboration even if the statement related to the character, reputation, credibility or criminal record of a witness and even if he knew or reasonably should have known that such a statement would have a substantial likelihood of prejudicing the adjudicative proceeding. *Id.* at ——, 111 S.Ct. at 2731. The Court further noted that the safe harbor provision provided the speaker with insufficient guidance because of the absence of settled legal interpretation of the terms "general" nature of the defense and "elaboration". *Id.*

Also writing for a 5–4 majority, Chief Justice Rehnquist upheld the constitutionality of the Nevada rule's "substantial likelihood" test. The Court acknowledged the importance of the public's right to be informed about happenings in the criminal justice system, but emphasized that when the dissemination of such information threatens the fairness of a criminal trial, regulation is within the acceptable bounds of the First Amendment. *Id.* at ——, 111 S.Ct. at 2743 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966)). Because of the very real threat to fair trials posed by attorneys' special access to discovery materials and client communications, the Court reasoned, attorneys representing clients in pending proceedings may be regulated under a less protective standard than the "clear and present danger" test estab-

lished for the press. *Id.* —— U.S. at ——, 111 S.Ct. at 2745. In weighing the First Amendment rights of attorneys in pending cases and the State's interest in fair trials and impartial jurors, the Court concluded the Nevada rule's "substantial likelihood of material prejudice" standard struck "a constitutionally permissible balance". *Id.*

In upholding the constitutionality of the "substantial likelihood" standard, the Court did not discuss whether the less protective "reasonable likelihood" standard might also constitute a permissible balance under the First Amendment. It merely stated that the "substantial likelihood" standard was "*a constitutionally permissible balance*", thereby implying that it was only one of many standards governing extrajudicial attorney speech that could conceivably pass constitutional muster. *Id.* (emphasis added). The rule must, of course, be "designed to protect the integrity and fairness of a state's judicial system, and ... impose[ ] only narrow and necessary limitations on lawyers' speech." *Id.* But such limits are proper "[e]ven if a fair trial can ultimately be ensured through *voir dire*, change of venue, or some other device". *Id.*

Close comparison of Rule 7 and the Nevada rule reveals that there is no constitutionally significant difference between the two standards. Rule 7 and the Nevada rule do not merely present the attorney with a generalized standard against which the attorney must independently gauge the appropriateness of all out-of-court speech. Both Rule 7 and the Nevada rule identify the particular kinds of extrajudicial statements deemed to

be prejudicial and these statements do not differ markedly despite the apparent difference in the two rules' standards.[4] Indeed, the Nevada rule might be construed to be even more restrictive of attorney speech than Local Rule 7 because its provisions appear to reach a broader range of extrajudicial attorney speech than its Eastern District of New York counterpart.[5] In any event, both rules restrict only those statements that are "likely to influence the actual outcome of the trial" or "likely to prejudice the jury venire" and therefore fall well within the bounds of *Gentile's* "narrow and necessary limitations on lawyers' speech." *Id.*

Moreover, courts in this and other judicial circuits have not hesitated to uphold the "reasonable likelihood" standard as an appropriate restriction on extrajudicial attorney speech. In *In re Application of Dow Jones & Co.*, 842 F.2d 603 (2d Cir.), *cert. denied*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988), the Court of Appeals for the Second Circuit addressed the propriety of a "gag" order in the Wedtech case that restrained extrajudicial speech of counsel and all other trial participants in the criminal proceeding. Publicity in the case had reached such a fevered pitch that Judge Cannella issued a restraining order pursuant to Local Rule 7(c) prohibiting all participants in the trial from making any statement concerning the case, except to report courtroom and other public proceedings. *Id.* at 605–06. The terms of the District Court's order in *Dow Jones* were far more restrictive than anything provided for in Rule 7(a), the provision at issue in the instant case.[6]

---

4. Both Rule 7 and the Nevada rule bar statements concerning the following: (1) the character, reputation, and criminal record of the accused (R. 7(a)(1); R. 177(2)(a)); (2) the identity, expected testimony, and credibility of prospective witnesses (R. 7(a)(4); R. 177(2)(a)); (3) any opinion as to the guilt or innocence of the accused (R. 7(a)(6); R. 177(2)(d)); (4) the possibility of a plea of guilty to the offense (R. 7(a)(5)); (5) the existence or contents of any confession, admission or statement by the accused or the accused's failure or refusal to make any such statement (R. 7(a)(2); R. 177(2)(b)); (6) the performance of any examination or tests or the accused's failure or refusal to submit to an examination or test (R. 7(a)(3); R. 177(2)(c)).

5. For example, Rule 177 prohibits extrajudicial statements concerning the identity or nature of physical evidence expected to be presented (R. 177(2)(c)), whereas Rule 7's safe harbor provision explicitly allows a description of physical evidence other than a confession, admission or statement at the time of seizure. The Nevada rule also prohibits commentary regarding information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial; Rule 7 has no such analogue.

6. Judge Cannella's gag order was promulgated pursuant to Rule 7(c) of the Southern and Eastern Districts of New York's Joint Rules for Criminal Proceedings, which provides:

 In a widely publicized or sensational case, the court, on motion of either party or on its

Various news agencies moved to vacate the order. The motion was denied and the news agencies promptly appealed. After determining that the press did in fact have standing to bring their appeal, the Second Circuit affirmed the District Court's order, rejecting the news agencies' argument that the "reasonable likelihood" standard imposed by the order pursuant to Rule 7 was an "insufficiently strict standard for determining the constitutionality of the gag order." (Gov't.'s Appendix, Tab 15, Brief of Dow Jones & Co., *et al.* at 21–25.) The Court reasoned:

> To decide whether the pretrial publicity justified the order, the standard by which to measure justification is whether there is a "reasonable likelihood" that pretrial publicity will prejudice a fair trial. *See Sheppard v. Maxwell,* 384 U.S. 333, 363 [86 S.Ct. 1507, 1522, 16 L.Ed.2d 600] (1966). The Local Criminal Rules for the Southern District of New York concerning extrajudicial speech also adopt a "reasonable likelihood" standard. As a direct result of the "Free Press–Fair Trial Report" of 1968, Local Rule 7(a) prohibits counsel from releasing any information "if there is a reasonable likelihood that such dissemination will interfere with a fair trial . . . ." The nature and extent of the pretrial news coverage in this case must be examined to see if the pretrial publicity in the light of that standard posed such a threat to defendants' Sixth Amendment rights as to justify the July 10 restraining order.

*Dow Jones,* 842 F.2d at 610 (citations omitted); *see also In re Russell,* 726 F.2d 1007, 1010 (4th Cir.) (in upholding order restraining witnesses from discussing case with media, Court held that "the evidence considered by [the District Court judge] adequately supported his determination that there was a reasonable likelihood that the defendants would be denied a fair trial without proscrib-

ing certain of petitioners' extrajudicial statements"), *cert. denied,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984); *Hirschkop v. Snead,* 594 F.2d 356, 370 (4th Cir.1979) (upholding virtually identical rule on grounds that, accompanied by specific prohibitions on attorney speech, the rule's "reasonable likelihood test divides the innocuous from the culpable, adds clarity to the rule and makes it more definite in application"); *United States v. Tijerina,* 412 F.2d 661, 666 (10th Cir.) (In rejecting counsel's argument that the order must be invalidated because it was not based upon a clear and present danger, the Tenth Circuit held that "reasonable likelihood suffices. The Supreme Court has never said that a clear and present danger to the right of a fair trial must exist before a trial court can forbid extrajudicial statements about the trial."), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969).

■ Thus, as *Gentile* and the other precedents discussed above make clear, the "reasonable likelihood" standard strikes a constitutionally permissible balance between an attorney's First Amendment rights and the Sixth Amendment imperative for a fair trial and an impartial jury. In any event, the particular circumstances of this case eliminate the need for such weighing. This Court must remain cognizant that this is a contempt proceeding and that the orders alleged to have been violated are presumed to be constitutional unless transparently invalid. Since a "clear and present danger" is not a necessary prerequisite to regulating extrajudicial attorney speech, this Court may hold that any sufficiently precise standard may be enforced in a contempt proceeding if (1) the Court entered a lawful order of reasonable specificity; (2) the order was violated; and (3) the violation was wilful. In the wake of *Gentile, Dow Jones,* and the other precedents discussed above, it is apparent that

---

own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, the seating anti conduct in the courtroom of spectators and news media representatives, the management and sequestration of jurors and witnesses and any other matters which the court may deem appropriate for inclusion in such order.

E.D.N.Y. Crim.R. 7(c). Unlike the order in *Dow Jones,* Judge Glasser's order was not a gag order to all participants in the trial, but rather, was an instruction to counsel to obey the applicable free press-fair trial provisions of Rule 7—Section (a), subsections (1) through (6), and the safe harbor provision in the paragraph immediately following Section (a).

Rule 7's "reasonable likelihood" standard is sufficiently precise to survive defendant's constitutional challenge.

### 4. Viewpoint Discrimination

██ Defendant's contention that Local Rule 7 so favors prosecutorial speech that it violates First Amendment jurisprudence also lacks merit. Defendant argues that Rule 7's safe harbor provision, which sets forth nine instances in which extrajudicial attorney speech is permissible, grants prosecutors greater latitude to make public statements than it does defense counsel.

Although defendant relies upon it extensively in his papers, *R.A.V. v. City of St. Paul*, — U.S. —, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), is inapposite. *R.A.V.* concerned a municipal ordinance in St. Paul, Minnesota, which proscribed certain kinds of bias-motivated disorderly conduct. The Supreme Court held that the ordinance was facially invalid because it imposed special prohibitions on displays that incite anger, alarm, or resentment based upon "race, color, creed, religion or gender", while allowing displays that invoke other topics. *Id.* at —, 112 S.Ct. at 2547. The Court found that such content-based discrimination amounted to "licens[ing] one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules." *Id.* at —, 112 S.Ct. at 2548.

This Court is faced with far different considerations than those that faced the Supreme Court in *R.A.V.*, however. First, unlike *R.A.V.*, this proceeding is not based upon an ordinance or a court rule such as Local Rule 7, but rather, at least one, possibly three, judicial orders issued well after the arrest and indictment of defendant's client. Thus, the supposedly viewpoint-discriminatory safe harbor provision of Rule 7 simply did not come into play in this case.

Second, Rule 7's safe harbor is a facially neutral provision, permitting certain categories of extrajudicial speech regardless whether the speaker is a prosecutor or defense counsel. The provision provides that the "lawyer or law firm" may: (1) announce "the facts and circumstances of arrest (including time and place of arrest, resistance, pursuit and use of weapons)"; (2) announce "the identity of the investigating and arresting officer or agency"; (3) announce "the length of investigation"; (4) disclose, at the time of seizure, "any physical evidence other than a confession, admission or statement, ... limited to a description of the evidence seized"; (5) disclose the "nature, substance or text of the charge, including a brief description of the offense charged"; (6) quote or refer "without comment to public records of the court in the case"; (7) announce "the scheduling or result of any stage in the judicial process"; (8) request "assistance in obtaining evidence"; and (9) announce "without further comment that the accused denies the charges." E.D.N.Y. Crim.R. 7.

Defendant argues that this provision might purport to be evenhanded, but that the reality of today's prosecutorial tactics, including the prolix indictment peppered with lurid descriptions of criminal activity, allows the Government to editorialize with regard to its case, while denying the same right to the defense. Defendant goes so far as to say that the safe harbor provides the defense bar with only one opportunity for extrajudicial comment—"announcing without further comment that the accused denies the charges". E.D.N.Y. Crim.R. 7. A close reading of the provision reveals that this is simply not true. The literal language of the provision does not limit its applicability to the prosecution, but rather, specifies that "the lawyer or law firm" is not precluded from engaging in the categories of speech enumerated therein. The provision permits the prosecution to recite the charges against the defendant, but it also permits defense counsel to deny them. Similarly, comments pertaining to the circumstances of arrest are not strictly limited to the prosecution. For example, defense counsel would be free under Rule 7 to publicly announce that the arrest was peaceable or that the arresting officers used excessive force. Indeed, close examination of the provision reveals that its provisions are innocuous and do not in any way give the prosecution some kind of tactical advantage in the battle for public opinion. Identity of the arresting officer, duration of the investigation, reference to public records, result of

any stage of the judicial process—these could be discussed by either party to the proceeding. Thus, defendant's argument with regard to viewpoint discrimination is without merit.

## II. *Motion to Dismiss Certain Specified Charges in the Order to Show Cause*

 In his second motion, defendant moves to dismiss certain specified charges in the Order to Show Cause on the grounds that the extrajudicial statements at issue in this case either concerned matters not proscribed by Rule 7 or were in reply to charges of misconduct against him or merely repeated arguments previously made in court. Like defendant's first motion regarding the validity of Judge Glasser's orders, the instant motion raises important factual issues that can only be adequately assessed after considering all the evidence presented at trial. Accordingly, this motion must be denied.

Defendant argues that Paragraphs 5(b), (c), (f), (i), (j), (k), (l), (n), and 7(d) [7] do not, on their face, violate the Order to Show Cause because they do not concern the "character and reputation of Gotti, his guilt or innocence and the merits of and evidence in *United States v. Gotti*" as proscribed by Local Rule 7. (Order to Show Cause ¶¶ 5, 7.) According to defendant, the extrajudicial statements set forth in the Order to Show Cause are mere fragments taken out of context so as to distort their true meaning. A review of the articles from which the offending statements were taken purportedly reveals that they do not concern any of the prohibited topics, but rather, one of the six following issues, permitted under Rule 7: (1) the Government's motion to hold Gotti in preventive detention pending the trial and how, in defendant Cutler's opinion, such detention violates the Constitution; (2) the Government's motion for an anonymous jury; (3) other trials, including the prior *Gotti* trials; (4) statements about Gotti unrelated to the evidence in *United States v. Gotti*; (5) the RICO statute and

defendant Cutler's view of the tactics employed by the Government in its aggressive prosecution of organized crime; and (6) comments by defendant Cutler pertaining to others' opinion of him.

Defendant further argues that Paragraphs 5(e), (g), (h), (j), 7(a), (b), (c), (d),[8] (f), and (g) concern extrajudicial statements explicitly allowed by Rule 7 in that they constituted either a response to charges of misconduct or a repetition of an argument made by the defense in open court. Local Rule 7's safe harbor provision provides that "[n]othing in this rule is intended to ... preclude any lawyer from replying to charges of misconduct that are publicly made against said lawyer." Rule 7 also provides that the "foregoing [six categories of prohibited extrajudicial speech] shall not be construed to preclude the lawyer or law firm ... from quoting or referring without comment to public records of the court in the case".

In response, the Government contends that these statements were all part of defendant's carefully crafted strategy to influence the jury pool by painting a stark portrait of corrupt Government prosecutors, seeking to frame Gotti with false and perjured evidence. As such, the statements violate Rule 7 by improperly characterizing the evidence and disparaging the merits of the Government's case.

The arguments presented by each side are indicative of the complex factual questions this Court must endeavor to resolve.[9] Assuming *arguendo* that there was at least one order to comply with Rule 7, we must still address whether there was an actual violation of the terms of that order and whether the violation was intentional. *See United States v. Turner,* 812 F.2d at 1566–68. Such an assessment will necessarily raise questions regarding the context of the extrajudicial statement with respect to the article or television program in which it was presented and to the stage in the criminal proceeding at

---

7. *See supra* n. 3.

8. *See supra* n. 3.

9. The Order to Show Cause specifically states that the maximum penalty to be imposed on the

defendant, should he be found guilty, is imprisonment for a term of six months. Accordingly, defendant is not entitled to a jury and this Court is the ultimate finder of fact.

the time the statement was made. In connection with such an inquiry, this Court might be aided by testimony from the journalists reporting the offending statements.[10] Similarly, this Court must consider defendant's wilfulness in making the statements and would benefit from possible testimony by defendant regarding his intentions, as well as testimony regarding the Government's extrajudicial statements and other media reports that might elucidate defendant's mindset. Accordingly, defendant's motion to dismiss certain specified charges in the Order to Show Cause must be denied.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss the Order to Show Cause in its entirety and his motion to dismiss certain specified charges in the Order to Show Cause must be and hereby are denied.

SO ORDERED.

---

10. Indeed, defendant indicates that he will in fact seek such testimony on the ground that the Government's proposed introduction of the news articles without the testimony of the reporters would constitute inadmissible hearsay. (Def.'s Mem. of Law in Supp. of Def.'s Supplemental Mot. to Dismiss Certain Specified Charges in the Order to Show Cause at 2 n. 3.)