**UNITED STATES of America, Appellee,**

v.

**Bruce CUTLER, Defendant–Appellant.**

No. 930, Docket 94–1382.

United States Court of Appeals, Second Circuit.

Argued March 23, 1995.

Decided June 19, 1995.

Frederick P. Hafetz, Goldman & Hafetz, New York City (Susan Necheles, Herald

Price Fahringer, of counsel), for defendant-appellant.

John J. Gallagher, Sp. Prosecutor on behalf of the U.S. of America, New York City, for appellee.

John H. Doyle, III, New York City, for amicus curiae New York Council of Defense Lawyers.

Leon Friedman, New York City (Arthur N. Eisenberg, of counsel), for amicus curiae The New York Civil Liberties Union.

Before: McLAUGHLIN, JACOBS, Circuit Judges, and KAUFMAN, District Judge.[*]

McLAUGHLIN, Circuit Judge:

The underworld exploits of John Gotti and the courtroom legerdemain of his attorney, Bruce Cutler, are now the stuff of legend. Cutler's last appearance on Gotti's behalf was in the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*). Notwithstanding the court's pre-trial admonition and orders to comply with Local Criminal Rule 7 of the Southern and Eastern Districts of New York ("Local Rule 7"), Cutler spoke repeatedly and heatedly to the media on the merits of the government's case against his client.

Exasperated with Cutler, Judge Glasser issued an order to show cause why he should not be held in criminal contempt. Judge Glasser then recused himself, and the matter was reassigned to then-Chief Judge Platt. After a five-day bench trial, the district court found Cutler guilty of criminal contempt, in violation of 18 U.S.C. § 401(3). The court sentenced Cutler to ninety days' house arrest and three years' probation, and also suspended him from practicing law in the Eastern District of New York for 180 days.

On appeal, Cutler argues that: (1) the orders and Local Rule 7 are unconstitutional; (2) the evidence, under the heightened standard applicable in First Amendment cases, does not support his contempt conviction; and (3) several aspects of his sentence were an abuse of discretion. Because Cutler could

have challenged the orders (and Local Rule 7) by appealing them, or seeking a writ of mandamus or declaratory relief, his constitutional challenge is collaterally barred. Moreover, the evidence amply supports his conviction. Finally, although aspects of his probation give us pause, we will not disturb his sentence.

## BACKGROUND

John Gotti was arrested on December 11, 1990, on racketeering charges. The murder of Paul Castellano, a rival mobster, was one of many predicate acts. This marked the fourth time that the government tried to end Gotti's criminal career, the previous attempts having failed. The then-United States Attorney, Andrew Maloney, announced the indictment at a press conference, where he called Gotti a "murderer, not a folk hero" and boasted that this time the government's case, which included extensive wiretap evidence, was much stronger than in the prior trials.

Gotti's lawyer, Bruce Cutler, a member of the New York Bar, countered by calling the prosecutors "publicity-hungry" and on a vendetta to frame his client. He was quoted in New York's four major newspapers—the *Daily News, Newsday*, the *New York Post*, and the *New York Times*. He also gave an interview on *Prime Time Live*, a nationally-broadcast television show, where he emphatically denied that Gotti was a mob boss.

### A. Local Rule 7

Cutler's and Maloney's comments seemed to be in tension with Local Rule 7, to phrase it charitably. That rule provides:

It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which a lawyer or law firm is associated, if there is a reasonable likelihood that such dissemination will interfere

---

[*] The Honorable Frank A. Kaufman, of the United States District Court for the District of Maryland, sitting by designation.

with a fair trial or otherwise prejudice the due administration of justice....

From the time of arrest, issuance of an arrest warrant or the filing of a complaint, information or indictment, in any criminal matter until the commencement of trial or disposition without trial, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, relating to that matter and concerning:

(1) The prior criminal record (including arrests, indictments or other charges of crime) or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the accused's name, age, residence, occupation and family status; and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in the accused's apprehension or to warn the public of any dangers the accused may present;

. . . .

(4) The identity, testimony or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law;

. . . .

(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

E.D.N.Y.Crim.R. 7(a).

B. *The December 20, 1990 "Admonition"*

When a detention hearing was scheduled, the district court granted Gotti's motion to close the hearing and seal all evidentiary submissions, including transcripts from the wiretaps. *See United States v. Gotti,* 753 F.Supp. 443 (E.D.N.Y.1990).

On December 20, 1990, after the hearing, Judge Glasser admonished the parties (and Cutler in particular) to try the case only in the courtroom, not in the press:

I feel very strongly about the conduct of this trial in an orderly and fair way and I feel very strongly about Local Rule 7 of the local rules of this Court.... That rule spells out, I believe, in some detail, what it is that it is appropriate for defense lawyers to be commenting about. You Mr. Cutler....

My admonition simply is, observe Local Rule 7

. . . .

The statements that this is a circus, it is a frame up, try your case in the courtroom. Okay I feel strongly about that.... It applies to the government, it applies to the defense. I propose to take such steps as I regard as being appropriate.

. . . .

Ladies and gentlemen, again, I am serious about fair trials. I am serious about Local Rule 7.... I don't want this trial to be conducted anywhere else but in this courtroom, in accordance with the rules, which are designed to [e]nsure fairness for the government, fairness for the defendant.

Undeterred, Cutler held a press conference outside the courthouse. He declaimed that the government had "thrown the Constitution out the window," mocked the government's witnesses as "bums," and erroneously described the government's tape recordings of wire-tapped conversations as the same ones used in earlier prosecutions. Cutler's performance at the press conference made the local news that night and the tabloids the next morning.

C. *The January 9, 1991 Order*

Three weeks later, the parties again appeared before Judge Glasser. The judge was not pleased with the continuing swirl of publicity, and again he instructed both parties to comply with Local Rule 7:

... Local Rule 7 ... carefully proscribes out-of-court comments by defense and by prosecutors.

. . . . I want [the leaks] to stop.

. . . .

. . . . I've made my position clear and I'll exercise all the power which is at my disposal to do whatever I can to enforce the orders of this Court and to hold those

persons who I may discover to be responsible for violating those orders accountable. I don't see any need to belabor that.

Nonetheless, the very next day, *Newsday* quoted Cutler about the tapes. He said the tapes contained denials by Gotti of involvement in the murder of Paul Castellano.

A week later, the government moved to disqualify Cutler and his co-counsel, Gerald Shargel, from representing Gotti during the trial, contending that Cutler and Shargel were "house counsel" for Gotti, and thus likely to be called as witnesses. Although the government filed its motion under seal, the district court elected to hold a public oral argument on the motion. After the hearing, New York's major daily newspapers, the television networks, and the Associated Press (the "media"), supported by the government, moved to unseal the briefs and evidence submitted in connection with the disqualification motion.

Gotti's lawyers opposed the motion, arguing that dissemination of the disqualification briefs and evidence would so taint potential jurors as to deny him a fair trial. The media, in support of the motions, noted that Cutler had already argued Gotti's case to the public and to the potential jury pool by "present[ing] a compelling, sympathetic portrait of a notorious defendant as a victim of prosecutorial zeal" and "government overreaching in the extreme." The court reserved decision on both the disqualification motion and the motion to unseal the briefs and record.

Meanwhile, Cutler continued to ignore the court's direction to comply with Local Rule 7. He was quoted in February, March, and July in all four major New York dailies. In addition, he gave a long interview to *Interview Magazine*, a glossy magazine, in which he repeated his allegations about government vendettas and accused the government of suborning perjury. He also showed up on *60 Minutes*, praising Gotti for his loyalty, integrity, and honesty, denying the existence of the mob, comparing the prosecutors to Senator Joseph McCarthy, and deprecating the tapes. Finally, he appeared on a local television news program, *Thirteen Live*, where he accused the government of persecuting Gotti.

### D. *The July 22, 1991 Order*

After four letters of complaint from the government about Cutler's extrajudicial statements, the parties appeared before Judge Glasser a third time on July 22, 1991. Judge Glasser once again ordered counsel to follow Local Rule 7: "Local Rule 7 . . . is, in essence, a kind of gag order. The thing you ought to say is, there is a case pending, the rules of this Court say I can't comment on it." Judge Glasser made clear he wanted no more comments to the press.

Days later, the district court disqualified Cutler and Shargel, primarily because they were likely to be called as witnesses at Gotti's trial. *United States v. Gotti,* 771 F.Supp. 552 (E.D.N.Y.1991). Two days after that, the court unsealed the tapes played at Gotti's detention hearing, noting that Cutler had called into question the integrity of the court and finding that any "[a]dditional publicity which may flow from unsealing the record *at this time* would . . . not give rise to a probability, substantial or otherwise, that the defendants' right to a fair trial will be prejudiced." *United States v. Gotti,* 771 F.Supp. 567, 569 (E.D.N.Y.1991) (emphasis added).

In the following week, stories about Gotti adorned the front pages of New York's dailies, together with excerpts from the transcripts of the wire-tapped conversations. In addition, television news programs obtained copies of the tapes of the conversations and repeatedly broadcast portions of them, allowing potential jurors to hear Gotti describe murders and other crimes.

Although he no longer represented Gotti in connection with the racketeering charges, Cutler countered with a media barrage of his own. The *pièce de résistance* came on August 13, 1991, a mere month before the scheduled trial date. (Gotti's new lawyers expected Judge Glasser to adjourn the trial to give them more time to prepare, but an adjournment had not yet been granted.) That day, Cutler appeared on a one-hour live television show called *9 Broadcast Plaza.* His performance, aptly summarized by the district court, included the following:

wherever Gotti lives, there is no problem with drugs and crime in the neighborhood; Gotti is not a danger to any community other than federal prosecutors; Gotti has "admirable qualities[,"] including being courageous, loyal, sincere, selfless and devoted to his family; Gotti is a "good man" and an "honorable man"; Gotti is not a "ruthless man"; Gotti is one of "the most compassionate men" Cutler knows; Gotti is "deadly against drugs"[;] .... the prosecutors "are doing everything they can to destroy John Gotti" and are "dealing in vendettas[,"] "on a witch hunt[,"] and "framing people"; the Government "threw the Constitution out the window" and is on a "vendetta" against Gotti; the prosecution is an "example of McCarthyism"; Gotti was being "persecuted" because of his "lifestyle" and "friends"; the prosecutors want to "destroy" Gotti "because of his popularity" and because "he's deadly against drugs"; the "evidence is phony"; the "tapes are phony"[;] .... the Government is "creating cases against individuals they target" by "giving freedom to drug dealers and murderers if they will sing the government's tune against the likes of John Gotti"; and ... jurors realize that "the witnesses lie" and that "even the federal investigators lie" and that is why they vote "not guilty unabashedly."

*United States v. Cutler*, 815 F.Supp. 599, 606 (E.D.N.Y.1993).

### E. *The Contempt Proceedings*

Not surprisingly, the *9 Broadcast Plaza* interview provoked yet another government letter complaining about Cutler. This time, Judge Glasser had had enough. He issued an order to show cause why Cutler should not be held in criminal contempt, in violation of 18 U.S.C. § 401(3). The order cited twenty-five instances of media coverage stemming from Cutler's public comments about the upcoming trial (the vast majority coming after the January 9 order), in which a common theme emerged: Gotti would be vindicated again; the prosecutors were a "sick and demented lot"; and the government's tapes were "snippets deliberately taken out of con-

text." The highlight was Cutler's performance on *9 Broadcast Plaza.*

After appointing a special prosecutor, Judge Glasser recused himself, and the matter was reassigned to then-Chief Judge Platt for trial. Cutler promptly moved to recuse all judges of the Eastern District of New York. He proposed that the case be transferred to the Southern District of New York, or to a judge from the Second Circuit Court of Appeals. The district court denied the motion. *United States v. Cutler*, 796 F.Supp. 710 (E.D.N.Y.1992).

Cutler then moved to dismiss the criminal contempt charges in their entirety, or, alternatively, some of them. He argued that Local Rule 7 was unconstitutional. The district court denied the motions. *Cutler*, 815 F.Supp. at 601–18.

Meanwhile, voir dire of the Gotti jury pool began. Of the 215 jurors interviewed, 214 had read or heard something about Gotti. Only forty-seven had formed an opinion about Gotti's guilt or innocence. Of these, forty-six thought he was guilty; only one believed he was innocent, based on things he had heard in his neighborhood. (Gotti was subsequently convicted and sentenced to life imprisonment; we affirmed. *United States v. Locascio*, 6 F.3d 924 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1645, 128 L.Ed.2d 365 *and cert. denied*, — U.S. —, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994).)

Cutler's contempt trial lasted five days. He did not contest the facts the government proffered. Moreover, he did not argue that he had no duty to comply with the orders and Local Rule 7 after his disqualification from representing Gotti. Instead, Cutler challenged the validity of the orders, arguing that Local Rule 7 was unconstitutional. In addition, he called two defense lawyers, James LaRossa and Jack Litman, as expert witnesses. Each testified that Cutler's comments had little chance of prejudicing the administration of justice or interfering with the trial. Cutler also relied heavily on the government's position earlier that publicity (from, e.g., unsealing the detention hearing records or the disqualification briefs) would *not* taint the jury pool. Finally, one of his

lawyers summarized the results of the voir dire, which suggested that Cutler's PR campaign had reaped little reward.

The district court found Cutler guilty of criminal contempt of two specific orders—those of January 9, 1991, and July 22, 1991—in violation of 18 U.S.C. § 401(3). *United States v. Cutler,* 840 F.Supp. 959 (E.D.N.Y. 1994). The district court held that Cutler was collaterally barred from contesting the validity of Judge Glasser's orders, since Cutler had chosen to violate them rather than appeal them. In addition, the court held that both orders categorically prohibited certain extrajudicial statements, if a reasonable person would expect the media to disseminate them. Alternatively, the court held that Cutler intended to influence prospective jurors, and that his conduct was reasonably likely to do so.

At sentencing, the district court imposed three years' probation on Cutler, coupled with three conditions: (1) a ninety-day period of house arrest; (2) a 180–day concurrent period of suspension from practicing within the Eastern District of New York; and (3) 600 hours of "non-legal" community service. Cutler was also ordered to pay a $5,000 fine. Cutler moved to "correct" the sentence to eliminate the probation and to vacate the suspension. The district court denied the motion, but did vacate the $5,000 fine, ordering Cutler to pay only the cost of his supervision during the probationary period.

Cutler now appeals.

## DISCUSSION

Cutler challenges the validity of the orders, contending that Local Rule 7 is unconstitutional. In addition, he argues that, under the heightened scrutiny employed in First Amendment cases, the evidence does not support his conviction. Finally, he challenges various aspects of his sentence.

## I. *The Collateral Bar Doctrine*

The government argues that Cutler is collaterally barred from contesting the validity of the orders. We agree.

Under the collateral bar doctrine, a party may not challenge a district court's order by violating it. Instead, he must move to vacate or modify the order, or seek relief in this Court. If he fails to do either, ignores the order, and is held in contempt, he may not challenge the order unless it was transparently invalid or exceeded the district court's jurisdiction. *See Walker v. City of Birmingham,* 388 U.S. 307, 317–21, 87 S.Ct. 1824, 1830–32, 18 L.Ed.2d 1210 (1967); *United States v. Terry,* 17 F.3d 575, 579 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *Matter of Providence Journal Co.,* 820 F.2d 1342, 1346–47 (1st Cir.1986), *modified,* 820 F.2d 1354 (1st Cir. 1987) (in banc), *cert. dismissed,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988). Even to invoke the "transparently invalid" "exception," however, a defendant must make some " 'good faith effort to seek emergency relief from the appellate court,' " *Terry,* 17 F.3d at 579 (quoting *Matter of Providence Journal Co.,* 820 F.2d 1354, 1355 (1st Cir.1987) (in banc), *cert. dismissed,* 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988)), or show compelling circumstances, such as a need to act immediately, excusing the decision not to seek some kind of emergency relief, *see Matter of Providence Journal Co.,* 820 F.2d at 1355.

Cutler concedes that he made no effort whatever to vacate or modify the order, or seek relief in this Court. But, relying on the briefs of the *amici curiae,* he tries to avoid the collateral bar doctrine by arguing that: (1) there was no appealable order until he was held in contempt; and (2) the orders were transparently unconstitutional. These arguments lack merit.

### A. *Appealable Order*

Cutler assumes that the orders were not appealable when issued. Yet, three years before then, we suggested that such orders were appealable. *See Application of Dow Jones & Co., Inc.,* 842 F.2d 603, 609 (2d Cir.) ("Here nothing prevented the restrained parties in the present litigation from challenging the [gag] order. Hence, despite their unquestioned standing to maintain this appeal, the news agencies may not assert defendants'

First Amendment rights when defendants refuse to challenge that infringement themselves."), *cert. denied,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). We confirmed this in *United States v. Salameh,* 992 F.2d 445 (2d Cir.1993) (per curiam), where we heard an interlocutory appeal of an oral gag order. *Id.* at 446–47.

Moreover, if Cutler truly believed that he could not appeal the orders, he unquestionably could have sought mandamus. *See Weight Watchers v. Weight Watchers Int'l, Inc.,* 455 F.2d 770, 775 (2d Cir.1972) (treating appeal of gag order as petition for mandamus); *see also In re Perry,* 859 F.2d 1043, 1046–50 (1st Cir.1988) (mandamus jurisdiction to hear appeal of gag order); *Levine v. United States Dist. Ct. for the Cent. Dist. of Cal.,* 764 F.2d 590, 593–601 (9th Cir.1985) (writ of mandamus granted modifying gag order), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986); *In re Russell,* 726 F.2d 1007, 1008–11 (4th Cir.) (gag order reviewable by mandamus), *cert. denied,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984).

Alternatively, Cutler could have sought a declaratory judgment striking down Local Rule 7, upon which the orders were based. *See Bernard v. Gulf Oil Co.,* 619 F.2d 459 (5th Cir.1980) (in banc) (addressing constitutionality of local rule requiring gag orders), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Hirschkop v. Snead,* 594 F.2d 356 (4th Cir.1979) (in banc) (same); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975) (same), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). That Cutler might have been unlikely to obtain a writ of mandamus or prevail in a suit for declaratory relief does not mean he should not have tried.

Finally, Cutler could have asked Judge Glasser to modify the orders. As the district court noted:

> If truly confounded by the requirements of Local Rule 7, he could have, at the very least, requested some clarification or guidance from the Court as to the acceptable parameters of extrajudicial speech. But, although he certainly had ample opportunity to do so in his three conferences with Judge Glasser, defendant never objected.

*Cutler,* 815 F.Supp. at 611; *see* E.D.N.Y.Crim.R. 7(c) ("[i]n a widely publicized or sensational case, the court, on motion of either party . . ., may issue a special order governing extrajudicial statements").

### B. *Transparent Invalidity*

Cutler attempts to clear these procedural hurdles by contending that the orders were transparently invalid. He points to vagueness, overbreadth, viewpoint discrimination, and prior restraint arguments raised by the amici. We need not address these arguments, however, because he made no " 'good faith effort to seek emergency relief from the appellate court,' " *Terry,* 17 F.3d at 579 (quoting *Matter of Providence Journal Co.,* 820 F.2d at 1355), and can point to no compelling circumstances justifying his decision to ignore the orders, *see Matter of Providence Journal Co.,* 820 F.2d at 1355 (newspaper facing deadline only eight hours after gag order issued acted in good faith). Accordingly, the "transparently invalid" exception cannot save him.

In sum, Cutler could have, and should have, sought modification of the orders in district court, challenged them on a direct appeal, or sought a writ of mandamus or declaratory relief. Having failed utterly to make any good faith effort to undertake even one of these steps, he cannot now challenge the orders' validity.

### II. *Sufficiency of the Evidence*

Before turning to the elements of the contempt conviction, we must clarify our scope of review. The orders here prohibited Cutler from discussing the merits of the Gotti case with the media only if his comments were reasonably likely to "interfere with a fair trial or otherwise prejudice the due administration of justice." E.D.N.Y.Crim.R. 7(a). As prior restraints, these orders implicate the First Amendment. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 556–62, 96 S.Ct. 2791, 2801–04, 49 L.Ed.2d 683 (1976).

As eight Justices of the Supreme Court have noted, in First Amendment cases, we independently review "the whole record in

order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Gentile v. State Bar*, 501 U.S. 1030, 1038, 111 S.Ct. 2720, 2726, 115 L.Ed.2d 888 (1991) (quotation marks and citations omitted) (Kennedy, J., dissenting in part, joined by Marshall, Blackmun, and Stevens, JJ.); *accord id.* at 1079, 111 S.Ct. at 2747 (Rehnquist, C.J., dissenting in part, joined by White, Scalia, and Souter, JJ.). We do so, however, only for so-called "constitutional facts," a concept that has confounded courts and commentators alike. *See, e.g., Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 176, 103 S.Ct. 2933, 2945–46, 77 L.Ed.2d 545 (1983) ("the line between 'historical fact' and 'constitutional fact' is often fuzzy at best"); George C. Christie, *Judicial Review of Findings of Fact*, 87 Nw. U.L.Rev. 14 (1992); Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum.L.Rev. 229 (1985).

We need not limn the precise contours of the constitutional fact doctrine. Suffice it to say that in First Amendment cases, we must scrutinize carefully the lower court's *application* of the relevant standards to the facts at hand. For example, in defamation suits brought by public figures, we review *de novo* whether the defendants acted with malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 283–91, 84 S.Ct. 710, 727–32, 11 L.Ed.2d 686 (1964). In breach of the peace prosecutions, we review *de novo* whether the defendants' conduct actually breached the peace. *See Cox v. Louisiana*, 379 U.S. 536, 544–51, 85 S.Ct. 453, 458–62, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 235–38, 83 S.Ct. 680, 683–85, 9 L.Ed.2d 697 (1963). In contempt cases involving media coverage critical of the administration of criminal justice in pending cases, we review *de novo* whether the coverage presents a "threat of clear and present danger to the impartiality and good order of the courts." *See Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1032, 90 L.Ed. 1295 (1946). These issues resemble mixed questions of law and fact, which we review *de novo*.

■ Accordingly, we are prepared to review *de novo* whether Cutler's comments were reasonably likely to prejudice the pro-ceedings, as set forth in Local Rule 7. We are also prepared to review *de novo* whether Cutler knew that his comments were reasonably likely to prejudice the proceedings, for if he did not, he could not have willfully disobeyed the orders. *Cf. Gentile*, 501 U.S. at 1037–38, 111 S.Ct. at 2725 ("the record does not support the conclusion that petitioner knew or should have known his remarks created a substantial likelihood of material prejudice") (Kennedy, J., dissenting in part, joined by Marshall, Blackmun, and Stevens, JJ.); *id.* at 1079, 111 S.Ct. at 2747 (after independently reviewing the record, "we are convinced that petitioner's statements were 'substantially likely to cause material prejudice' " and that petitioner made them "for the express purpose of influencing the venire") (Rehnquist, C.J., dissenting in part, joined by White, Scalia, and Souter, JJ.).

With these principles in mind, we proceed to parse each element of the contempt conviction. To hold Cutler in criminal contempt, the government had to prove beyond a reasonable doubt that: (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful. *See* 1 Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal*, ¶ 20.02, at 20–26.1 (1994); *see also Rojas v. United States*, 55 F.3d 61, 63 (2d Cir.1995) (per curiam) (federal court may punish, by fine or imprisonment, a person who " 'willfully violate[s] the specific and definite terms of a court order' ") (quoting *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 659 (2d Cir.1989), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990)).

### A. *Reasonably Specific Orders*

■ A defendant cannot be held in contempt absent a "definite and specific" order of which he had notice. *United States v. Charmer Indus., Inc.*, 722 F.2d 1073, 1079 (2d Cir.1983). Obviously, Cutler had notice of the orders; he was present when Judge Glasser issued them. He argues, however, that the orders never made clear what sort of comments were *verboten*, because the orders referred to two other standards in addition to Local Rule 7: the standard upheld in *Gen-*

*tile,* which prohibits statements substantially likely to cause material prejudice to a judicial proceeding; and the general prohibition against public disclosure of sealed materials. Cutler did not raise this issue below, however, and thus cannot raise it now. *See Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995) (generally, "appellate courts do not consider issues that were not raised in the district court").

■ In any event, Cutler has cited, and we have unearthed, no case where an appellate court reviewed the specificity of an order as a constitutional fact. Accordingly, the ordinary rules regarding sufficiency apply: Cutler bears a heavy burden on this issue, and we view the evidence of the orders' specificity in a light most favorable to the government. *See United States v. LaPorta,* 46 F.3d 152, 162 (2d Cir.1994). Moreover, the clarity of an order must be evaluated by a reasonableness standard, considering both the context in which it was entered and the audience to which it was addressed. *See United States v. Turner,* 812 F.2d 1552, 1565 (11th Cir.1987).

■ Here, Judge Glasser repeatedly mentioned Local Rule 7 every time he met with counsel to discuss pre-trial publicity. Moreover, on the latter two occasions he expressly ordered counsel to comply with Local Rule 7. And, if this was not enough, on the last occasion, he warned "that unless the kind of statements which I regard as being violative of [Local] Rule 7 don't cease," he would initiate contempt proceedings. Given that courts can expect lawyers to comply with less specific orders than laymen, *see id.,* the orders were more than specific enough to support a contempt conviction.

### B. *Violations of the Orders*

Next, Cutler mounts a two-pronged challenge to the finding that he violated the orders. He argues that: (1) even when comments fall within the six categories specifically mentioned in Local Rule 7, the rule proscribes them only if they are reasonably likely to prejudice the proceedings; and (2) none of the comments cited in the order to show cause were reasonably likely to prejudice the

proceedings. The first argument has merit; the second does not.

Local Rule 7 proscribes generally any statements by counsel that "a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation ..., if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." The rule then enumerates several specific categories of forbidden speech, but without repeating the "reasonable likelihood" standard. For example, an attorney cannot offer his opinion as to his client's guilt or innocence, or as to the merits of the case. E.D.N.Y.Crim.R. 7(a)(6). Reasoning that the reasonable likelihood standard did *not* apply to comments within the six categories, the district court held that if a comment fell within a category and if a reasonable person would expect that the comment would be disseminated by the press, the comment was prohibited. *See Cutler,* 840 F.Supp. at 963 n. 3, 965; *Cutler,* 815 F.Supp. at 612. This goes too far.

Were we writing on a completely clean slate, we might adopt the district court's approach. But, the Fourth Circuit has already rejected it. *See Hirschkop,* 594 F.2d at 365–68. Reviewing a local rule virtually identical to Local Rule 7, the *Hirschkop* court held that a *per se* proscription of certain types of speech was overbroad and violated the First Amendment. To pass muster, speech that fell within a proscribed category had to be reasonably likely to interfere with a fair trial or otherwise prejudice the due administration of justice. *See id.* at 367–68.

■ We see no need to adopt an interpretation of Local Rule 7 that might offend the Constitution. Accordingly, we conclude that speech falling within the six categories violates Local Rule 7 only if it is also reasonably likely to interfere with a fair trial or the administration of justice. *Cf. In re Application of Dow Jones & Co., Inc.,* 842 F.2d at 610 (reviewing under "reasonable likelihood" standard gag order imposed by district court under Local Rule 7(c) that barred virtually

all categories of extrajudicial speech by parties).

That said, we believe there is a strong, albeit rebuttable, presumption that speech falling within the six categories violates Local Rule 7, as these categories "furnish the context in which the 'reasonable likelihood' standard is intended to operate." *Cutler,* 815 F.Supp. at 612; *see Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press–Fair Trial" Issue,* 87 F.R.D. 519, 523–24 (1980) ("reasonable likelihood" standard "together with the explicit rules that follow it, suffices to inform attorneys what they may or may not say for publication regarding imminent or pending criminal litigation in which they are involved"); *cf. Chicago Council of Lawyers,* 522 F.2d at 251 (court may formulate a rule that "comment concerning certain matters will presumptively be deemed a serious and imminent threat to the fair administration of justice").

■ Despite our different approach to Local Rule 7, we need not disturb the result reached by the district court. The district court, at the government's request, made findings of fact under the assumption that the reasonable likelihood standard did apply to speech that fell within proscribed categories, and concluded that, under that standard, Cutler had still violated the orders. Cutler challenges this finding on several grounds. They all lack merit.

First, he contends that the district court ignored his expert witnesses' testimony. We disagree. The experts, criminal trial lawyers, stated their opinion that Cutler's extensive comments could have had no prejudicial effect. The court characterized this testimony as self-serving and worthy of little weight, given that as defense lawyers, the experts shared an inherent bias. Thus, the court did not ignore the testimony; it simply discounted its probative value, which was well within its discretion. *Contrast Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 805 F.2d 49, 54–55 (2d Cir.1986) (district court erred by giving properly admitted evidence no weight at all).

Next, Cutler argues that the voir dire of the Gotti jury venire demonstrates that his comments were not reasonably likely to prejudice the proceedings. Again, we disagree. True, evidence that the Cutler-generated publicity did not in fact taint the jury pool may be relevant to the issue whether those statements were likely to interfere with a fair trial. *See Gentile,* 501 U.S. at 1047, 111 S.Ct. at 2730–31 (Kennedy, J., dissenting in part, joined by Marshall, Blackmun, and Stevens, JJ.). But *Gentile* never said that such evidence was dispositive, nor did *Gentile* require that actual prejudice be shown. Instead, Local Rule 7's "standard for controlling pretrial publicity must be judged at the time a statement is made." *Id.; see id.* at 1081, 111 S.Ct. at 2748 (Rehnquist, C.J., dissenting in part, joined by White, Scalia, and Souter, JJ.) (rejecting argument that attorney could not be sanctioned for statements to media if no prejudice actually resulted).

Finally, Cutler chastises the district court for taking his comments out of context. He notes that Gotti's trial received more press coverage and publicity than any other trial in New York history. He contends that in the midst of a veritable firestorm of anti-Gotti publicity, the few cinders he added could not possibly have tainted the proceedings. He adds that the timing of his comments—made five months before the trial began—underscores their relative harmlessness. We are not persuaded, however, by Cutler's Uriah Heep pose.

Cutler vastly understates the effect defense lawyers can have on prospective jurors. As *Gentile* cautions, "lawyers' statements are likely to be received as especially authoritative" because "lawyers have special access to information through discovery and client communications." *Id.* at 1074, 111 S.Ct. at 2744–45 (majority opinion). Indeed, *Gentile* affirmed the very portion of Nevada's pretrial publicity rule that considered statements of the sort Cutler made as "ordinarily" likely to have a "substantial likelihood of materially prejudicing" a pending criminal proceeding. *See id.* at 1065–76, 111 S.Ct. at 2740–46; *id.* at 1081–82, 111 S.Ct. at 2748–49 (O'Connor, J., concurring).

Moreover, although the timing of Cutler's comments may be significant, *see id.* at 1044,

111 S.Ct. at 2729 (Kennedy, J., dissenting in part, joined by Marshall, Blackmun, and Stevens, JJ.) (when comments preceded trial by six months, "only the most damaging information could give rise to any likelihood of prejudice"), this factor does not necessarily weigh in Cutler's favor. Our review of the record makes clear that his "statements were timed to have a maximum impact, when public interest in the case was at its height immediately after" the disqualification briefs and record were unsealed. *Id.* at 1079, 111 S.Ct. at 2747 (Rehnquist, C.J., dissenting in part, joined by White, Scalia, and Souter, JJ.).

Finally, we note that in *Gentile*, four Justices were prepared to hold that relatively innocuous statements made at a single press conference some six months before trial in the midst of extensive and sensationalized publicity were *substantially* likely to materially prejudice the proceedings. *See id.* at 1076–81, 111 S.Ct. at 2745–48 (emphasis added). In contrast, Cutler spoke repeatedly and heatedly to the press in the months preceding Gotti's trial. Given the more lenient "reasonable likelihood" standard here, coupled with Cutler's performance on *9 Broadcast Plaza* alone, we do not doubt that a majority of the *Gentile* Court would find that Cutler violated the orders.[1]

We thus find that Cutler's comments were reasonably likely to prejudice the Gotti proceedings.

### C. *Willfulness*

 Criminal contempt generally "requires a specific intent to consciously disregard an order of the court." *United States v. Berardelli*, 565 F.2d 24, 30 (2d Cir.1977) (quotation marks omitted). Cutler contends that he did not willfully disobey the orders because he did not know the comments listed in the order to show cause were reasonably

likely to prejudice the proceedings. This argument taxes the most generous credulity.

 We hold attorneys to a higher standard of conduct than we do lay persons. *See Turner*, 812 F.2d at 1565. Accordingly, we may infer Cutler's willfulness from his "'reckless disregard for his professional duty.'" *Rojas*, at 55 F.3d at 63 (quoting *In re Levine*, 27 F.3d 594, 596 (D.C.Cir.1994) (internal quotation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995)). Cutler's persistent attempts to try Gotti's case in the media, despite Judge Glasser's repeated warnings, belie any notion that he did not intend these particular comments to prejudice the proceedings, or that he did not recklessly disregard the orders.

Any doubt about this is dispelled by Cutler's participation in a Brooklyn Law School symposium on April 25, 1991, before the Gotti trial began. There, he expounded upon the virtues of a friendly press:

> ... I've really grown to appreciate and respect Anthony DeStefano from *New York Newsday*[,] Pete Bowles for *New York Newsday*, Lenny Buder for *The New York Times*, and Arnie Lubasch from *The New York Times* and some of the other reporters who I think do a conscientious job. Do I have selfish reasons? I have honest reasons that I don't want to alienate them, *that I want the prospective veniremen out there to feel that I mean what I say and say what I mean, and if that can spill over and help my client, then I feel it's important for me to do that.*

Joint App. at 1659 (emphasis added). With a smoking gun like this, we cannot fault the district court for finding that the government proved Cutler's willfulness "not only beyond any reasonable doubt, but beyond any possible doubt." *Cutler*, 840 F.Supp. at 970.

---

1. Significantly, Cutler neither argued below nor argues now that, having been disqualified from the case, he was no longer subject to the orders—and Local Rule 7—when he appeared on *9 Broadcast Plaza*. In any case, Local Rule 7 governs attorneys "associated with the ... defense." Cutler's disqualification came some seven months after Gotti's arrest and indictment. During these months, Cutler played a crucial role in

Gotti's defense. Moreover, even after the disqualification, Cutler continued to press Gotti's case to the media, the performance on *9 Broadcast Plaza* being only the most egregious example. We thus have little difficulty in finding that Cutler was still "associated" with Gotti's defense after the disqualification and therefore subject to Local Rule 7 and the orders to comply therewith.

In short, the record amply supports findings that the orders were specific, and that Cutler's comments were reasonably likely to prejudice prospective jurors and were willfully made with the intent of prejudicing prospective jurors. Accordingly, we affirm Cutler's criminal contempt conviction.

### III. *The Sentence*

Finally, Cutler challenges his sentence of probation on several grounds. He largely repeats arguments he raised below in his motion to correct his sentence. Although the potentially severe collateral consequences of his probation gave us pause, we, like the district court, find his arguments unconvincing.

The Guidelines offer little guidance on sentences for defendants convicted of criminal contempt, in violation of 18 U.S.C. § 401(3), a misdemeanor. The applicable guideline, U.S.S.G. § 2J1.1, instructs the court to apply U.S.S.G. § 2X5.1, which is for "Other Offenses." Section 2X5.1, in turn, tells the court to "apply the most analogous offense guideline," and, "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b)." That statute, in turn, commands the court to "impose an appropriate sentence." 18 U.S.C. § 3553(b).

Attempting to do just that, and relying on 18 U.S.C. § 3561(c)(2), which allows up to five years' probation for misdemeanors, the district court imposed three years' probation on Cutler. Relying on 18 U.S.C. § 3563(b)(20) and (22), the court added a ninety-day period of house arrest. In addition, apparently relying on its authority to impose occupational restrictions as a condition of probation, *see* 18 U.S.C. § 3583(d), as well as 18 U.S.C. § 3563(b)(22), the court imposed a 180-day concurrent period of suspension from practicing within the Eastern District of New York. Cutler challenges the suspension, the house arrest, and the probation.

■ Because a sentencing court has broad discretion in fixing conditions of probation, we review a sentence of probation only for an abuse of discretion. *See United States v. Tolla,* 781 F.2d 29, 32 (2d Cir.1986). We

will, however, carefully scrutinize "unusual and severe conditions, such as one requiring the defendant to give up 'a lawful livelihood.'" *United States v. Sterber,* 846 F.2d 842, 843 (2d Cir.1988) (quoting *United States v. Pastore,* 537 F.2d 675, 681–82 (2d Cir. 1976)).

■ Pointing to our decisions in *Sterber* and *Pastore,* Cutler argues that because New York's Appellate Division already has well-established procedures for disciplining attorneys, the district court should have referred the matter to it, rather than summarily suspend him from practicing law. Those cases are inapposite, however.

In *Sterber,* we vacated a probation condition that required a probationer to surrender a professional license granted by the state because the state had a well-defined statutory procedure for resolving allegations of professional misconduct. *Id.* at 843–44. Similarly, in *Pastore,* we vacated a probation condition that required the defendant to resign from the Bar, reasoning that disbarment should take place only under the procedures and for the reasons prescribed by state statutes and regulations. *Pastore,* 537 F.2d at 683. Underlying both decisions was our concern over intruding upon areas regulated by states. *See Sterber,* 846 F.2d at 844 (revoking a professional license "implicates important notions of federalism"); *Pastore,* 537 F.2d at 682 (questioning whether a federal district judge may require a defendant to give up a state-granted professional license where the state provides a comprehensive regulatory system to handle the professional misconduct of those it licenses).

Here, however, Cutler was not ordered to surrender his license, nor was he required to resign from the Bar. The court did no more than prohibit Cutler "from practicing [law] during the probationary period," which we suggested in *Sterber* would not "constitute an abuse of the court's discretion." *Sterber,* 846 F.2d at 844. Moreover, the probation condition simply suspended Cutler from practicing law before a single *federal* court, the Eastern District of New York. Accordingly, the condition does not implicate significantly the federalism concerns of *Sterber* and *Pastore.*

Next, Cutler argues that the district court erred by not following the Eastern District's detailed procedures for disciplining attorneys who practice there. We disagree. True, the Eastern District has an elaborate procedure for disciplining attorneys, and requires that an attorney convicted of a misdemeanor be given "notice and an opportunity to be heard" before he or she can be suspended from the practice of law. E.D.N.Y.Gen.R. 4(c), (g). But, in the Eastern District:

> [m]isconduct of any attorney in the presence of this court *or in any manner in respect to any matter pending in this court may be dealt with directly by the judge in charge of the matter* or at said judge's option referred to the committee on grievances, or both.

E.D.N.Y.Gen.R. 4(k) (emphasis added). Cutler's criminal contempt stemmed from a "matter pending in" the Eastern District of New York. Since Judge Glasser had voluntarily recused himself, Chief Judge Platt represented the court in charge of that matter and thus could discipline Cutler directly.

 Noting that the order to show cause mentioned only the possibility of a $5,000 fine or six months' imprisonment, Cutler also contends that he had no notice that he could be summarily suspended from practicing law. This argument has superficial appeal, as neither party could point to another case where a district court suspended an attorney from practice. But, Cutler concedes that a sentencing court can impose occupational restrictions as a condition of probation. *See* U.S.S.G. § 5F1.5(a). Moreover, the district court could have referred the matter to the Eastern District Grievance Committee, which in turn could have suspended him. E.D.N.Y.Loc.R. 4(g), (k). Finally, had Cutler been imprisoned for six months, he could not have practiced law anyway. Thus, a lawyer like Cutler should have known that interruption of his practice was a very real possibility.

Next, Cutler argues that the district court failed to make sufficient findings of fact to justify suspending him from practicing law in the Eastern District. We disagree. The Guidelines recommend imposing restrictions on a defendants' professional activities if there is "a reasonably direct relationship between [his] ... profession and the conduct relevant to the offense," U.S.S.G. § 5F1.5(a)(1), and there is a reasonable basis to believe such a restriction is necessary to deter defendant from committing similar conduct in the future, U.S.S.G. § 5F1.5(a)(2).

 The connection here between Cutler's profession and his contemptuous behavior—committed while acting in his professional capacity—is readily apparent. Moreover, Cutler's flagrant disregard of Judge Glasser's orders provides ample "reason to believe that, absent such a restriction, [he] will continue to engage in unlawful conduct similar to that for which [he] was convicted." U.S.S.G. § 5F1.5(a)(2). Thus, a remand for further factfinding is pointless. *Cf. United States v. Tropiano*, 50 F.3d 157, 164 (2d Cir.1995) (suggesting that, where relationship between uncharged conduct and offense of conviction is intuitively obvious, court need not make detailed findings of fact to support an upward departure).

Cutler also challenges the house arrest provision. The district court sentenced Cutler to ninety days' house arrest, but did not include a provision allowing Cutler to work. This may conflict with 18 U.S.C. § 3563(b)(20), which allows a district court to require a defendant on probation to "remain at his place of residence *during non-working hours.*" *Id.* (emphasis added). However, that statute also permits a district court to impose "other conditions" as may be appropriate, § 3563(b)(22), making absolute home-confinement an option. We therefore decline to set aside this aspect of the sentence. Rather, Cutler may seek clarification from the district court as to whether he may work a lawyer's usual hours during the house arrest. We read the government's brief to suggest that he will have little opposition on this score. Presumably, the government recognizes that a court's discretion on this issue will ordinarily be exercised to permit (or even encourage) defendants to pursue their livelihoods.

 Finally, Cutler challenges the length of his probation. Three years, however, is well within the five-year maximum term of

probation for misdemeanors. *See* 18 U.S.C. § 3561(c)(2). And, we do not doubt that the term of probation here will "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence" to future contemptuous conduct by attorneys. 18 U.S.C. §§ 3562(a), 3553(a).

That said, the potentially severe collateral consequences of Cutler's probation are troubling. Cutler fears that his probation will likely result in his suspension by the New York courts from practice for three years. *See Matter of Kazdin,* 183 A.D.2d 108, 109, 590 N.Y.S.2d 405, 406 (1st Dep't 1992) (per curiam) ("attorney on probation may not practice law"). The district court dismissed this specter summarily, noting that it "never intended and does not now intend . . . to put any limit on *any* disciplinary authority to suspend *or even disbar the defendant for any period of time whatsoever for his conduct here." United States v. Cutler,* No. 91–CR–1189 (TCP), slip op. at 2 (E.D.N.Y. June 21, 1994) (emphasis added).

We agree with the district court that the state licensing consequences of Cutler's contempt conviction are for the Appellate Division to address, not us. We emphasize, however, that we consider Cutler's probation necessary to punish past contemptuous conduct and deter similar conduct in future *federal* proceedings. We have no occasion to pass judgment on Cutler's conduct in state proceedings, nor do we believe it necessary for his rehabilitation to require that he not practice at all for the duration of his probation. Finally, we are not unmindful that New York courts in the past have merely censured attorneys convicted of criminal contempt in federal courts, rather than suspend them from practicing law. *See Matter of Perkins,* 69 A.D.2d 160, 419 N.Y.S.2d 1 (1st Dep't 1979) (per curiam); *Matter of Castellano,* 46 A.D.2d 792, 361 N.Y.S.2d 23 (2d Dep't 1974) (memorandum).

## CONCLUSION

We have considered all of Cutler's arguments, and find them without merit. We recognize that Cutler did not singlehandedly generate the media circus that threatened the fairness of the final Gotti trial; federal prosecutors and law enforcement officials deserve their share of the blame. Moreover, we sympathize with the plight of a defense lawyer torn between his duties to act as an officer of the court and to zealously defend his client. Nonetheless, a lawyer, of all people, should know that in the face of a perceived injustice, one may not take the law into his own hands. Defendant did, and now he must pay the price.

In some quarters, doubtless, this affirmance will elicit thunderbolts that we are chilling effective advocacy. Obviously, that is neither our intention nor our result. The advocate is still entitled—indeed encouraged—to strike hard blows, but not unfair blows. Trial practice, whether criminal or civil, is not a contact sport. And, its tactics do not include eye-gouging or shin-kicking.

In this case, a conscientious trial judge tried mightily to limit the lawyers to press statements that were accurate and fair. The defendant's statements were dipped in venom and were deliberately couched to poison the well from which the jury would be selected. Such conduct goes beyond the pale, by any reasonable standard, and cannot be condoned under the rubric of "effective advocacy."

We are not unaware that it has become *de rigueur* for successful criminal defense lawyers to cultivate cozy relationships with the media. *See* Joyce Egginton, *Circle of Fire: Murder and Betrayal in the "Swiss Nanny Case"* (1994) (commending a media-savvy defense lawyer and criticizing a prosecutor for not taking advantage of the media in an age where "old ethics" may no longer apply). Indeed, in this very case, defendant urged law students to do just that. As Seneca once observed, "quae fuerant vitia mores sunt" ("what once were vices are now the manners of the day"). L. Annaeus Seneca, *Epistulae ad Lucilium,* Epis. xxxix, at ¶ 6. The Bruce Cutler case must now stand as a caution that enough of the "old ethics" survive to bar flouting the Canons of Professional Conduct. *See* DR 1–102(A); *Matter of Giampa,* 211 A.D.2d 212, 628 N.Y.S.2d 323 (2d Dep't 1995).

Lord Henry Brougham, who defended Queen Caroline on a criminal charge of adultery, was an early apostle of what today would be known as Rambo litigation tactics.

In his argument before the House of Lords, he summed up his view of the advocate's role: "the first great duty of an advocate [is] to reckon everything subordinate to the interests of his client." Twenty-three years later, at a dinner for barristers, with the eighty-six-year-old Lord Brougham in the audience, Chief Justice Alexander Cockburn responded—to loud cheers from the distinguished assembly—

"[t]he arms which an advocate wields he ought to use as a warrior, not as an assassin. He ought to uphold the interests of his clients *per fas,* not *per nefas.* He ought to know how to reconcile the interests of his clients with the eternal interests of truth and justice."

The Times (London), Nov. 9, 1864, *quoted in 5 Encyclopedia Britannica* 941 (1947).

The judgment of conviction and sentence are AFFIRMED.